## THE ROBERT FULTON.

(Circuit Court of Appeals, Second Circuit. April 10, 1911.)

No. 230.

SHIPPING (§ 81*)—INJURY TO TOW FROM SWELL OF STEAMER—NEGLIGENT NAVIGATION.

Injury to a flotilla of six canal boats, when passing down the Hudson River, from the swell of a meeting steamer, *held* due to the fault of the steamer in passing at too high speed: it being shown that several lines of the tow were broken, including two new six-inch towing lines, and that the boats had been recently repaired and were sufficiently seaworthy for the ordinary risks of navigation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 345; Dec. Dig. § 81.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Blanche E. Morse against the steamer Robert Fulton; the Hudson River Day Line, claimant. Decree for claimant, and libelant appeals. Reversed.

Foley, Martin & Nelson (W. J. Martin and Frank A. Spencer, Jr., of counsel), for appellant.

Convers & Kirlin (John M. Woolsey and J. Parker Kirlin, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. June 30, 1909, a tow composed of the steam canal boat James W. Morse and five other canal boats laden with pig iron, made up in the manner called "ship-lapped" (the steam canal boat pushing the flotilla ahead of her), was proceeding down the Hudson River on the east side between Schodack creek and Stuyvesant. She was followed by the tug McCullough with three boats tandem in the following order: Anna B., Alberta, and Columbia. The steamer Robert Fulton, of the Hudson River Day Line, going up on the west side bound for Albany, passed the Morse's tow at Stuyvesant Shoal, opposite Bronk's Island. The river at this point is not over 1,500 feet wide and the 12-foot channel not over 1,000 feet wide. The vessels probably passed each other not over 500 feet apart. The speed of the Fulton from Hudson to Albany was at the rate of 12 miles an hour, which is her scheduled time.

It is the practice of the line to slow before passing wharves or tows, so as to prevent injury to the boats from the steamer's displacement

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

waves and to enter on the daily trip reports the wharves and tows for which they slow and the times at which they do so. It is said that, although their practice is to slow for tows of canal boats, they do not enter anything with reference to them on the reports. The Fulton slowed at 4:45 p. m. probably to 8 miles in approaching Scott's Wharf, some 2,500 feet lower down the river, and did not slow again until 4:55, when she approached Bronk & Gay's Wharf. Between these two points it would have been her practice to go at her regular speed, and we have no doubt that when she passed the Morse's tow she was so proceeding. The narrowness and shallowness of the channel imposed the duty of especial care on the steamer. No note was made of passing or of slowing for either of these tows, and no witness from the steamer recollects anything about either of them.

As the Fulton approached the Morse slowed down; but the swells broke the lines of several of the boats, among others two new six-inch towing lines of the James W. Morse, with the result that the tow broke up, the boats pounded each other, breaking some planks, and began to leak as the result of the opening of their seams. The tow stopped at Athens, and afterwards at Rondout, and was able by puddling the leaks with sawdust at these places and by the use of the pumps to complete her voyage and deliver her cargo at a point in Long Island Sound. Upon their return to New York the boats were sent to the yard of the O'Donnelly & Anderson Dry Dock Company at Jersey City for repairs and notice of survey given for July 13th. They were from 17 to 20 years old, but well kept up, and had undergone their usual spring overhauling about 3 months before this accident at an expense of $1,557. The principal repairs were for calking and spiking, and the cost for the five boats was but $200. Thereafter they carried grain cargoes, which it is well known require boats in good condition.

The District Judge found that the Fulton was carefully navigated and that the injuries which the boats sustained were due to the fact that they were not in a condition to withstand contingencies reasonably to be expected:

"The questions presented to the court become, therefore, these: Was the steamer being navigated with due caution? Were the canal boats reasonably fit to withstand the contingencies of navigation on the day and at the place in question; that is, were they fit to receive the displacement waves of a large steamer navigated with reasonable care? In my opinion the navigation of the Fulton was careful. She did everything that could have occurred to reasonably competent and skillful navigators of the Hudson River. Nevertheless she did, and necessarily must, cause some displacement waves. In my judgment the waves she did cause would have made no trouble for a flotilla of boats reasonably fit to endure the pounding necessarily to be expected. * * * In this case libelant has not shown that his boats were in good condition for contingencies reasonably to be expected. The burden is on him, and he has not borne it; on the contrary, it is in my judgment affirmatively shown that no damage would have resulted to boats of reasonable strength."

Both the steamer and the tow had a right to navigate the river; it being the duty of the tow to meet the ordinary risks of navigation and of the steamer not to injure a tow so constituted by her swells.

There can be no doubt that the tow was broken up by the Fulton's swells, and we think it can hardly be said that swells sufficient to part two new six-inch towing lines were reasonably to be expected. It is said that this was because the lines of the tow were drawn too taut; but a new five-inch line between the Anna B. and the Alberta, which were from six to ten feet apart in the following tow, was also broken by the swells. If the boats had sustained injuries while maintaining their make-up, we should not be disposed to disturb the finding of the court below; but the fact that two new six-inch lines were parted in the Morse's tow and a new five-inch line in the tow of the McCullough convinces us that the swells of the Fulton were not such as tows had any reason to expect and provide against, and we think that the boats were sufficiently seaworthy for the ordinary risks of navigation.

The decree is reversed, with costs, and the court below directed to enter the usual interlocutory decree and order of reference in favor of the libelant and to dismiss the petition of the Hudson River Day Line against the steam canal boat James W. Morse, without costs.