**BERNERT TOWBOAT COMPANY, Plaintiff,**

v.

**USS CHANDLER (DDG 996), in rem, and United States of America, in personam, Defendants.**

**Civ. No. 86–547–RCB.**

United States District Court, D. Oregon.

June 29, 1987.

David F. Bartz, Jr., Schwabe, William-son, Wyatt, Moore & Roberts, Portland, Or., for plaintiff.

Charles H. Turner, U.S. Atty., Jack G. Collins, First Asst. U.S. Atty., Chief, Civ. Div., Portland, Or., Philip A. Berns, Atty. in Charge, West Coast Office, Torts Branch, Civ. Div., Warren A. Schneider, Asst. Atty. in Charge, WCO, Torts Branch, Civ. Div., U.S. Dept. of Justice, San Francisco, Cal., for defendants.

BELLONI, District Judge.

The plaintiff, Bernert Towboat Company, brings this suit for damage to its barge, the B-1, caused by the swell of the USS CHANDLER as the two vessels passed in the Columbia River. Plaintiff asserts that the ship traveled too fast up the river and negligently created a dangerous swell. The government contends that the B-1's unseaworthy condition caused the damage. The principal disputed issues at trial were the situs of the collision, the CHANDLER's speed, whether it is possible for the CHANDLER to produce a dangerous swell, and whether the B-1 is seaworthy.

## BACKGROUND

On June 6, 1985 the USS CHANDLER a United States guided missile destroyer (563 feet long, with a beam of 55 feet, twin propellers, and 80,000 horsepower), steamed up the Columbia River from Astoria to Portland, Oregon, for the annual Rose Festival. At the same time the tug MARY B was pushing the barges B-1 and B-22 down river. The barges were loaded with wood chips and lashed together in tandem. The MARY B was tied to the B-1. The plaintiff built the B-1 for hauling wood chips on the Columbia River; its entire business consists of transporting chips on the river. Prior to the encounter with the CHANDLER the plaintiff's vessels made this same round trip voyage 2100 times without serious incident.

Captain Jim Easley has 27 years of experience on the Columbia River. He piloted the MARY B at the time of the accident and is the only eye witness. I find his testimony credible. He testified that the MARY B and the two barges passed four navy ships that day with no problems. Then he met the CHANDLER. Watching the CHANDLER travel up the river he noticed that its swell created a good deal of white water on the Northern end of Martin Island. When the CHANDLER was nearly abeam he saw an unusually large swell coming toward the MARY B. Quickly slowing the engines he shifted the MARY B into neutral and rode over the swell. Captain Easley knew that the swell caused some damage so he called the crew out of the forecastle to attend to the barges. He also called the USS BRONSTEIN, the vessel following the CHANDLER, and asked it to slow because he was having problems.

The crew resecured the two barges and the MARY B continued down river. However the B-1, holed by the swell, filled with water and soon began to list. This list caused much of the B-1's cargo to spill. The crew beached the B-1 on Sandy Island to prevent it from completely sinking. The plaintiff salvaged the remaining cargo, pumped out and patched the B-1, and took it to a shipyard for repair.

## I. LIABILITY

■ The Public Vessels Act provides for in personam admiralty jurisdiction over the United States for damage caused by a public vessel of the United States. 46 U.S.C. § 781 et seq. The USS CHANDLER is a public vessel. This action is within the court's admiralty jurisdiction. 28 U.S.C. § 1333.

■ Although jurisdiction is in personam, the Public Vessels Act allows recovery on admiralty principals of in rem as well as in personam liability. *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901 (1945). The Act allows the court to grant judgment on in rem as well as in personam principles, except that the public vessel is not subject to seizure or arrest. *Id.*

1. *Liability is Based on Fault*

■ Collision Liability is based on fault. Therefore negligence must be

shown before liability is imposed. *Complaint of McLinn*, 744 F.2d 677, 680 (9th Cir.1984). The term "collision" is used in its broadest sense so that it applies to a tug striking a ships wake. *See Peoples Natural Gas Co. v. Ashland Oil, Inc.*, 604 F.Supp. 1517, 1523 (W.D.Pa.1985). The standard of care in collision cases is provided by specific statutory provisions, the concept of reasonable care, and the requirements of good seamanship. *Arabian American Oil Co. v. Hellenic Lines, Ltd.*, 633 F.Supp. 659, 665 (S.D.N.Y.1986). The CHANDLER violated a statutory rule and failed to exercise reasonable care when it created a dangerous swell.

### 2. The CHANDLER's Duty not to Create a Dangerous Swell

▇ Both the tug and the ship have a right to navigate the Columbia River. The tug has the duty to meet the ordinary risks of navigation and the ship must not injure a seaworthy tow with its swell. *The ROBERT FULTON*, 187 F. 107, 108 (2nd Cir. 1911). The ship's officers must take all reasonable precautions to insure that the tug and its tow are not injured by the ship's swell. *The CHESTER W. CHAPIN*, 155 F. 854, 859 (D.C.N.Y.1907). If properly constituted the tug need not warn the ship it may presume the ship will make a safe passing. *Id.* Ordinary prudence demands that the ship slow down to avoid endangering a seaworthy tow. *The COLUMBIA*, 61 F. 220 (3rd Cir.1894)[1].

▇ However when the tow is improperly made up or is otherwise unseaworthy there is no liability for swell damage. *Alice E. Conway v. United States*, 1930 A.M.C. 2013 (E.D.N.Y.1930). The CHANDLER had a duty not to create a dangerous swell.

### 3. The Inland Rules of the Road Provide a Statutory Standard

The Inland Rules apply to navigation in the Columbia River. 33 U.S.C. § 2001(a).

Rule 6, the Safe Speed Rule, is of primary importance here. Rule 6 provides in pertinent part:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

33 U.S.C. § 2006. In determining a safe speed the vessel must consider: (1) visibility, (2) traffic density, (3) maneuverability of the vessel including stopping distance and turning ability, (4) the state of the wind, sea and current and the proximity of navigational hazards, and (5) the draft in relation to the available depth of water. *Id.* The CHANDLER was required to travel at a safe speed in order to avoid a collision. Violation of the safe speed rule imposes severe procedural sanctions.

### 4. The Pennsylvania Rule

▇ When, at the time of a collision, a vessel is in violation of a statutory rule intended to prevent collisions, the burden shifts to the vessel to prove that its fault could not have been a cause of the accident. *The Steamship Pennsylvania v. Troop*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). The Pennsylvania rule shifts the burden of proof as to causation to the statutory offender, but it does not by itself impose liability. *United Overseas Exp. Lines v. Medluck Compania Maviera*, 785 F.2d 1320, 1325 (5th Cir.1986). The violator may rebut this presumption by showing that the violation could not have been a contributing cause of the accident. *Id.* This burden is difficult for the statutory offender to carry and the court of appeals requires strict adherence to the rule. *Waterman Steamship Corp. v. Gay Cottons*, 414 F.2d 724, 736 (9th Cir.1969).

A violation of the safe speed rule invokes the Pennsylvania rule. *See Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1567–68 (11th Cir.1985);

---

**1.** *See also Scalici v. Moran Towing*, 1986 A.M.C. 2645, 2652 (E.D.N.Y.1986) [Available on WESTLAW, DCT database]; *Sweeney v. Car/Puter Intern. Corp.*, 521 F.Supp. 276 (D.S.C.1981); *The*

*MAJESTIC*, 48 F. 730 (2nd Cir.1891); Griffin, *The American Law of Collision*, section 259 (1949).

**1458**

*Complaint of Magnolia Towing Co., Inc.,*
764 F.2d 1134, 1136–38 (5th Cir.1985).

## DISCUSSION

### 5. *The Situs of the Collision*

The location of the collision is important because the CHANDLER kept excellent navigation records, and its speed can be calculated with precision for any segment of its course up the Columbia River.

Commander Natter, the CHANDLER's captain, placed the point of meeting North of Goat Island and South of Sandy Island. But Commander Natter's testimony at trial was vague. In addition he admitted that he had never before transited the Columbia River, and that he had no independent recollection of the meeting point. He relied on the CHANDLER's navigation chart and the engine room log to determine the meeting point. I find that his testimony on the collision location is not credible.

Captain James Easley testified that the collision occurred between light number 62, and buoy number 60. I find his testimony credible. Captain Lloyd Beeler, the MARY B's master, also placed the collision near light number 62. On cross examination Captain Showalter, the Columbia River Pilot aboard the CHANDLER, stated that he did not disagree with Captain Easley's testimony on the location. Captains Easley, Showalter, and Beeler all agreed to the location of the collision and they are all very familiar with the Columbia River. I find that the collision occurred near light number 62 near 45° 57' 30" N, 122° 49' W, and that the collision happened at approximately 1355 hours.

### 6. *The CHANDLER's Speed*

■ The CHANDLER took frequent and accurate position fixes on its trip up the river. These fixes were recorded on the CHANDLER's navigation chart and the time noted by each fix. In addition the engine room keeps a "bell log" that records each engine speed order and the time of the order. Plaintiff's expert, Lieutenant Commander Dietz, USNR, using the CHANDLER's chart and the bell log, calculated the CHANDLER's speed at the time of collision. He conservatively placed the CHANDLER's speed at 20.1 knots over the ground. Plaintiff's other expert, Dr. Bruce Adee, estimated the CHANDLER's speed to be higher.

Pilot Showalter and Commander Natter both placed the CHANDLER's speed when it met the MARY B at between 10 and 15 knots. I reject Pilot Showalter's testimony because it conflicts with the engine room bell log and the position fixes on the CHANDLER's chart. I reject Commander Natter's testimony because he had no independent recollection of where the meeting occurred. He also testified on cross-examination that at the relevant time he had ordered a calibrated engine speed of 26.9 and 25 knots.

Taking into consideration river current and other environmental factors I find that the CHANDLER was traveling at a speed of more than 21 knots over the ground when it passed the MARY B. I also find that under the circumstances this speed is, as a matter of law, a violation of the safe speed rule.

### 7. *The CHANDLER's Swell*

Captain Easley testified that he rode over an unusually large swell that was pushed ahead of the CHANDLER. During the trial he drew a picture of this swell and compared it to waves commonly encountered in the Columbia River. The government initially contended that his explanation is physically impossible because a ship's wake is left behind the ship, not pushed ahead. However at trial the government's expert conceded that Captain Easley's explanation is plausible.

Plaintiff's expert, Dr. Bruce Adee, is a Professor at the University of Washington. He is also a naval architect and a hydrodynamicist. He testified that in unrestricted waters a ship creates a transverse wave that makes an angle of about 20° with the ship's centerline. These waves are left behind the ship. However, a ship traveling at high speed in a restricted channel will create a much different wave pattern. The pattern created is a function of the ship's

speed and the water depth. Professor Adee stated that based on the river depth and the ship's speed, the CHANDLER produced a swell that made an angle between 54° and 65° from the ship's centerline. This unusual wave, which is called a soliton, is relatively steep and creates a shelf of water. He estimated the soliton's height at four to six feet.

William G. Day testified for the government on this point. He agreed with Professor Adee on the underlying scientific principles of soliton creation. He said that a soliton wave can be 90° to the ship's centerline and can even be pushed ahead of the ship. He opined that if the CHANDLER traveled faster than 19 knots it could produce a soliton.

I find Captain Easley's and Professor Adee's testimony credible concerning the existence of the soliton. I find that the CHANDLER produced a soliton wave which was higher than five feet. I find that the soliton posed a danger to seaworthy vessels capable of meeting the ordinary risks of navigation on the Columbia River.

### 8. *The B–1's Seaworthiness*

■ The government's main defense is that the B–1's light construction made it unseaworthy because it could not meet ordinary river hazards.

After the accident, Captain Ralph Pruett surveyed the B–1 for the government. The government submitted his testimony by deposition. Surveyor Pruett testified that the B–1's deck fixtures were welded to the deck when they should have been secured through the deck with gussets or bracing. He testified that if the B–1 had proper deck fixtures the accident never would have happened. He said the deck fixtures failed when they were subjected to an overload stress. On cross examination he testified that although he had surveyed 600 barges during his career he had only surveyed one

Columbia River chip barge, the B–1. He also admitted that he did not know how the barges were made up that day or the amount of stress placed on the deck fixtures.

Surveyor Terrance Purdom also surveyed the B–1, and the plaintiff submitted his testimony by deposition. He testified that the B–1 was seaworthy. He stated that it is a light barge but that it is sufficient for use on the Columbia River. Barges built for the open sea are built heavier because of the stresses created by running in a seaway. About forty percent of his surveying experience is on the Columbia River. He has surveyed other Columbia River chip barges.

I credit Surveyor Purdom's testimony because he is much more familiar with Columbia River barges than is Surveyor Pruett. Surveyor Pruett also admitted he did not know how much stress caused the deck fixtures to fail or how the barges were made up. In addition, Surveyor Purdom's testimony is reinforced by the fact that the plaintiff's vessels made 2100 round trip voyages up and down the Columbia River through adverse weather with no serious incidents. I find that the B–1 was seaworthy at the time of the accident.

### CONCLUSIONS ON LIABILITY

■ Based on all the evidence I conclude that the CHANDLER's Officers breached their duty to exercise reasonable care to avoid creating a dangerous swell.

■ At the time of the collision the CHANDLER was in violation of the safe speed rule, a statutory rule intended to prevent collisions; therefore the burden rests on the CHANDLER to prove that it could not have been the cause of the collision. *United Overseas Exp. Lines v. Medluck Compania Maviera,* 785 F.2d at 1324 [2]. The CHANDLER failed to produce

---

**2.** Under the circumstances, the CHANDLER's speed is as a matter of law a violation of the safe speed rule. The CHANDLER, a 563 foot ship, was traveling in excess of 21 knots up a channel that is about 300 yards wide with shoal water to the port and starboard. There were other vessels on the river, and the prospect of

people on the river banks. The damage done to the plaintiff's barge is proof that the CHANDLER's speed was excessive. In addition, there were no extenuating circumstances such as an in extremis situation that required the CHANDLER to travel at a speed that placed life and property in danger. Captain Easley testified

any evidence that I found probative that the damage to the B-1 was not caused by the CHANDLER's swell. Moreover the plaintiff proved, independent of the Pennsylvania Rule, that the CHANDLER caused the damage to the B-1. I conclude that the CHANDLER's swell caused the damage to the B-1.

There is no merit in the government's defense that the B-1 is unseaworthy. It is seaworthy and the MARY B's crew exercised commendable seamanship throughout the entire episode. The CHANDLER is one hundred percent at fault for the collision. I now consider the plaintiff's damages.

## II. DAMAGES

### 1. *Anti-Assignment Act*

The government concedes that with one exception the amounts set out in the pretrial order are the proper measure of damages in this action. The government contends that the plaintiff cannot recover for the lost cargo because recovery would violate the Anti-Assignment Act (the "Act").

■■■ The Act provides that voluntary assignments of claims against the government are void. 31 U.S.C. § 3727. The Act's three main objectives are to: (1) prevent the buying up of claims against the government, (2) to avoid multiple payment of claims, and (3) to preserve government defenses and counterclaims which might not be available against an assignee. *Kingsbury v. United States,* 563 F.2d 1019, 1024, 215 Ct.Cl. 136 (1977). Numerous exceptions to the Act exist when these purposes are not served. The Act does not apply to involuntary assignments, assignments by operation of law, assignments for the benefit of creditors, or subrogation. *New York Guardian Mortgagee Corp. v. Cleland,* 473 F.Supp. 422, 434 (S.D.N.Y. 1979).

that once the B-1 started to list, the MARY B was in danger of capsizing. It may have been good seamanship, or good luck, on the part of the MARY B's crew that prevented more serious consequences from this accident.

Jim Forsman, President of Bernert Towboat Company, testified that Longview Fibre, the cargo owner, demanded payment from the plaintiff for the lost cargo. He also testified that the plaintiff was not at fault for the cargo loss and that there is no written contract between the plaintiff and cargo owner. When asked why he paid for the lost cargo he replied that the cargo disappeared while on the plaintiff's vessel and he felt the plaintiff had a moral obligation. Longview Fibre is the plaintiff's only customer so as a practical matter it was probably good business judgment to pay for the cargo. The plaintiff claims that this effected an assignment by operation of law.

■■■ A contract of private carriage creates a bailee-bailor relationship. The carrier owes the cargo owner a duty of due care and is not an insurer of the cargo. *Close v. Anderson,* 442 F.Supp. 14, 16 (W.D.Wa. 1977). If the cargo is delivered in good condition and arrives at the destination in a damaged condition a presumption of negligence arises. But the burden to prove that cargo damage is the carrier's fault still rests on the cargo owner. *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 110, 62 S.Ct. 156, 160, 86 L.Ed. 89 (1941).

■■■ I found the plaintiff faultless in the collision. Therefore the plaintiff had no legal obligation to pay for the lost cargo. Longview Fibre had a claim against the government for cargo damage but it is not a party to this litigation. The plaintiff is therefore asserting the cargo owners rights. *See The Beaconsfield,* 158 U.S. 303, 307, 15 S.Ct. 860, 861, 39 L.Ed. 993 (1895). As such it is a voluntary assignment of the cargo owner's rights to the plaintiff which is technically at odds with the Act[3].

**3.** Some older cases hold that the Act does not apply to suits under the Public Vessels Act. *See Ozanic v. United States,* 188 F.2d 228, 231 n. 7 (2nd Cir.1951) (citing cases). This proposition seems questionable at best.

### 2. *Affirmative Defense*

■ Plaintiff contends that the government waived the defense because it did not raise the Act in its answer. Fed.R.Civ.P. 8(c). Generally, failure to raise an affirmative defense in the answer results in waiver. *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir.1983). However, the defendant raised the Act in the pre-trial order, which has the effect of amending the pleadings. *999 v. C.I.T. Corp.*, 776 F.2d 866, 870 (9th Cir.1985). *See also* Fed. R.Civ.P. 16(e); L.R. 235–2(c). The plaintiff claims that amendment through the pre-trial order is ineffective because it unfairly prejudices the plaintiff. Whether or not to grant leave to amend is within the court's discretion. The four main considerations are: "(1) undue delay, (2) bad faith, (3) prejudice to the opponent, and (4) futility of amendment." *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th Cir. 1986).

The government filed its answer in June, 1986. It first raised the Act in rough drafts of the pretrial order in February, 1987. A seven-month delay is long, but the plaintiff still had three months before trial to prepare to meet the defense. There is no evidence of bad faith on the government's part. Allowing amendment is prejudicial to the plaintiff because it bars recovery for cargo loss. However, the plaintiff is not *unfairly* prejudiced by assertion of a valid defense. I conclude that the pretrial order amended the pleadings and that the government prevails on the anti-assignment issue.

### 3. *Interest*

■ Under the Suits in Admiralty Act and the Public Vessels Act the plaintiff is only entitled to prejudgment interest if provided by contract, 46 U.S.C. § 782, and post judgment interest is limited to four percent. 46 U.S.C. § 743. Two circuit courts have recently held that the government is not liable for interest except as provided by the two statutes. *See Transorient Navigators Co., S.A. v. M/S SOUTHWIND*, 788 F.2d 288, 293–94 (5th Cir.1986); *SCNO*

*Barge Lines, Inc. v. Sun Transp. Co.*, 775 F.2d 221, 227 (8th Cir.1985). I agree. The plaintiff cannot recover prejudgment interest, and postjudgment interest is limited to four percent.

### CONCLUSIONS ON DAMAGES

The government has agreed that pursuant to a finding of liability the amounts set out in the pre-trial order are the proper measure of damages. The plaintiff is awarded damages as set out in the pre-trial order with the exception of the amounts paid to the cargo owner.

This opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).