In re OCEAN FOODS BOAT COMPANY, an Oregon corporation, as owner of F/V McKINLEY, Plaintiff,

In a cause for exoneration from or limitation of liability.

OCEAN FOODS BOAT COMPANY, Owner of D/F/V McKINLEY, GRE/Talbot, Bird, for Albany Insurance; Pacific Marine Insurance Co.; Harlock, Williams, Lemon, Ltd., for Camat, Plaintiff(s),

v.

M/V TOSCA, in rem; Wallenius Lines; Rederi Ab Soya; Stockholm, in personam, Defendants/Third Party Plaintiffs,

v.

Charles Scott PARKER and Keith A. Christensen, Third Party Defendants.

Verna C. HELLBERG, Personal Representative of the Estate of Edward Albert Hellberg, Deceased, Plaintiff,

v.

REDERI AB SOYA, STOCKHOLM, Defendant/Third Party Plaintiff,

v.

OCEAN FOODS BOAT COMPANY, as owner of the D/F/V McKINLEY, Charles Scott Parker and Keith A. Christensen, Third Party Defendants.

Keith A. CHRISTENSEN, Plaintiff,

v.

REDERI AB SOYA, STOCKHOLM, Defendant/Third Party Plaintiff,

v.

OCEAN FOODS BOAT COMPANY, an Oregon corporation, Charles Scott Parker and Keith A. Christensen, Third-Party Defendants.

Charles Scott PARKER, Plaintiff,

v.

REDERI AB SOYA, STOCKHOLM, and Wallenius Lines, Defendants/Third Party Plaintiff,

v.

OCEAN FOODS BOAT COMPANY, an Oregon corporation, Charles Scott Parker and Keith A. Christensen, Third Party Defendants.

Civ. Nos. 86–1071–BE, 86–1193–BE, 86–1250–BE, 86–1553–BE and 87–0115–BE.

United States District Court, D. Oregon.

Aug. 1, 1988.

1254

Guy C. Stephenson, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for Ocean Foods Boat Co., GRE/TALBOT, BIRD, Pacific Marine Ins. and Harlock, Williams, Lemon.

Frank Pozzi, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., for claimant Hellberg.

Paul N. Wonacott, Robert I. Sanders, Wood, Tatum, Mosser, Brooke & Landis, Portland, Or., for M/V TOSCA, Wallenius Lines, Rederi AB Soya, Stockholm.

Burl L. Green, Green, Griswold & Neuberger, Portland, Or., for claimant Parker.

Garry L. Kahn, Portland, Or., for claimant Christensen.

## AMENDED OPINION

BELLONI, District Judge.

The moonlit evening of August 14, 1986 afforded perfect visibility. On the open ocean nine miles Northwest of the Columbia River bar, the M/V TOSCA and the F/V McKINLEY collided. Edward Hellberg, the McKINLEY's deckhand, died from exposure. After a three day trial the court awarded the statutory survivors of Mr. Hellberg $534,684.79 for pre-death pain and suffering, lost wages, and loss of services. This opinion explains the basis for liability and apportions the fault between the two vessels.

## PROCEDURAL POSTURE

The procedural posture of this consolidated case is somewhat complex and requires a short explanation. The parties to this action are: (1) Ocean Foods Boat Company Inc., the McKINLEY's owner; (2) the McKINLEY's insurers, GRE/TALBOT, BIRD, for Albany Insurance, Pacific Marine Insurance Co., and Harlock, Williams, Lemon, Ltd., for Camat; (3) Rederi AB Soya, Stockholm, the owner of the TOSCA; (4) Wallenius Lines, the TOSCA's operator, (5) the TOSCA *in rem;* and (6) the McKINLEY's crew members Scott Parker, Keith

Christensen, and the statutory survivors of Edward Hellberg [1].

The collision between the two vessels originally spawned five actions. Ocean Foods filed a petition for limitation of liability and the crew members and the TOSCA filed damage claims within the statutory period. Ocean Foods and the McKINLEY's insurers filed a separate admiralty action against the TOSCA for the value of the McKINLEY. Each of the McKINLEY's crew members filed separate actions against the TOSCA. The court held a hearing in April 1987 to determine a fair and efficient way to resolve these five related cases. As a result of that hearing the cases were consolidated, and the parties agreed to a court trial on all the issues. The limitation action and the suit by the McKINLEY against the TOSCA were filed as admiralty actions under Fed.R.Civ.P. 9(h). Parker and Christensen have settled their cases.

## FACTUAL BACKGROUND

On August 14, 1986 the McKINLEY, a 75–foot wooden vessel, was fishing in the Grays Canyon area off the Washington coast. The hold was nearly full of fish, and the crew had torn the net on a snag. Captain Parker, on his daily 15:00 radio schedule, informed Ocean Foods that he was going to deliver the catch and repair the net. This required a several-hour trip to Astoria, Oregon, the first port up the Columbia River. Parker used the Loran C to set a course of about 145 degrees true from Grays Canyon to buoy number 7 at the mouth of the Columbia River. He stood watch from 15:00 to 17:00 and then Keith Christensen took over. Christensen served as a temporary replacement for the McKINLEY's regular deckhand. Although Christensen had previously been to sea this was his first trip on the McKINLEY. Parker explained the operation of the Loran, radios, and the automatic pilot to Christen-

1. The interests associated with the McKINLEY are represented by one law firm. The same is true for the TOSCA. For convenience, the parties associated with the McKINLEY will be jointly referred to as either Ocean Foods or McKINLEY. The interests associated with the TOSCA will be jointly referred to as the TOSCA.

sen, and told him that Hellberg would turn on the running lights before Hellberg went to bed.

It was a fine day with a light Northwest wind and an eight to ten foot swell. Christensen navigated the McKINLEY uneventfully for several hours. Just past 22:00 he sighted the TOSCA visually. At six miles the TOSCA came on his radar screen, bearing nine degrees on the starboard bow. Although the distance between the two vessels closed, the bearing did not change. Unknown to Christensen this was a sure sign of an imminent collision with the TOSCA.

Meanwhile, the TOSCA, a 649–foot car carrier, proceeded in nearly the opposite direction on an intended course of 345 degrees true. Chief Mate Clay Dirland was the officer on watch. Able Seaman Ola Andersson served as lookout.

Around 22:14 Andersson reported a radar contact on the TOSCA's port bow[2]. Dirland went to the radar repeater and Andersson pointed out the contact. Dirland testified that the contact looked similar to sea clutter, and that he thought it might be from fishing gear left in the water[3]. Dirland did not adjust the sea clutter control. He went to the port window and scanned the ocean with his binoculars, but saw nothing. Dirland went back to the radar repeater and looked for another thirty seconds, but could not see a contact.

Dirland went to the ARPA, an automatic radar plotting aid that is computer assisted. The ARPA processes the radar data and generates predictive vectors and other ship movement information which is then used in collision avoidance. It can be set on either automatic or manual. That evening it was set on manual. Dirland could see nothing on the ARPA. Consequently, he could not use the ARPA to help avoid the collision. The testimony at trial established that the ARPA works as a "slave" to the radar. If the radar is misadjusted, then the ARPA may not work.

After Dirland looked in the ARPA, Andersson reported a visual sighting twenty degrees off the port bow. Dirland searched the horizon with his binoculars but could see nothing. He continued on the same course at a speed of twenty knots. At 22:21 Andersson reported a vessel dead ahead. Dirland sounded the warning signal, put the rudder hard astarboard, and shifted the pitch of the propeller to neutral.

On the McKINLEY Captain Parker arose at 22:12. He checked to see if the McKINLEY was on course, and he saw the TOSCA ahead. Christensen told him that the two vessels would make a safe passing, and that he would call Hellberg to stand watch once the TOSCA passed. Parker observed the TOSCA on the radar and through the window. He then went into the galley and sat there for a few minutes. Around 22:21 Christensen called to Parker, "Oh my God, you have to get up here. The guy is turning into us." Parker saw the TOSCA 300 yards away, and he yelled for Christensen to get Hellberg out of his bunk. Because the TOSCA looked like it would hit the McKINLEY square in the wheel house, Parker put the throttle full ahead and turned the rudder hard to port. He stepped out on the fore deck and watched as the TOSCA hit the McKINLEY just aft of the wheel house. The boat heaved violently to port and the force threw him to the deck. The boat righted and then the bow rose in the air, as if the McKINLEY were sinking stern first, and slid down the TOSCA's starboard side.

**2.** In his deposition, Andersson stated that eight minutes before the collision, he saw the radar target twice, thirty seconds apart. The target was five to ten degrees on the port bow, at a distance of three miles.

**3.** "Sea clutter" is the mariner's term of art for radar return that is created by the reflection of radar waves off ocean swells. Sea clutter is considered interference on the radar screen because it may mask targets that are close to the vessel. The radar has a sea clutter control adjustment which can be used in conjunction with the receiver gain control to suppress sea clutter out to a limited distance from the ship. Defense Mapping Agency, *Radar Navigation Manual,* at 59 (4th Ed.1985) (TOSCA's Exhibit 192). The TOSCA's crew testified that the radar could pick up sea gulls on very calm water.

Parker saw Hellberg's foot sticking out of the wheel house door. Hellberg was struggling to pull Christensen free. He succeeded because all three men ended up on the fore deck. What was left of the McKINLEY was sinking fast. As the boat sank they climbed on top of the wheel house to escape the rising water. They saw the McKINLEY's Kaino life ring floating a few yards off, but there was no sign of the vessel's inflatable life raft. As the McKINLEY went under they jumped into the ocean, swam to the ring, and tied themselves to it. Hellberg had a survival suit, still in its package, but he was so exhausted by the cold and the ordeal that he was unable to summon the strength to put it on. He gave it to Parker but Parker, too, did not have the strength to put it on. The Kaino life ring came equipped with a strobe light which Parker turned on, and he also shot an emergency flare. The TOSCA's captain spotted the strobe light.

As the three men clung to life ring they watched the TOSCA drift about a mile away. They wondered why the TOSCA was not attempting to rescue them. After twenty minutes in the water a Coast Guard helicopter found them and dropped its rescue basket. Then, without explanation, it picked the basket up and flew away. The three cursed the Coast Guard, and began to wonder if they would survive the ordeal. The large ocean swells continued to wash over them; they saw other fishing vessels but had no way to signal.

The helicopter hovered over the TOSCA and returned twenty minutes later, after it had dumped some of its fuel. Once again the basket was lowered, and the three swam over to it and piled in. The first attempt to lift the men failed because Christensen was tangled in the cable. Once Christensen was freed they tried again. Christensen and the Kaino life ring were in the basket, while Parker and Hellberg dangled off the sides. When they were several feet out of the water the line tying Hellberg to the Kaino life ring gave way, and Hellberg tumbled back into the ocean. Parker and Christensen reached the helicopter and collapsed on the floor. A helicopter crew member dove into the ocean and ten minutes later brought an unconscious Hellberg aboard. Hellberg died on the flight to the hospital.

## DISCUSSION

The issues submitted to the court are Ocean Foods petition for limitation of liability, the suit against the TOSCA for the value of the McKINLEY, and Hellberg's claims against Ocean Foods and the TOSCA. The TOSCA has reserved for later disposition its claims for contribution against Ocean Foods.

### A. OCEAN FOODS PETITION FOR LIMITATION OF LIABILITY

■ The Limitation of Shipowners' Liability Act, 46 U.S.C.App. § 183 *et seq.* provides that if a marine casualty occurs without the fault or privity of the vessel owner, the owner is entitled to limit liability to its interest in the vessel and the pending freight. Federal courts have interpreted "interest" in the vessel to mean the owner's interest after the accident. In this case Ocean Foods' interest is zero because the McKINLEY lies on the bottom of the Pacific Ocean. The decision of whether to allow limitation is made in two steps: the court must determine (1) what acts of negligence or unseaworthiness caused the accident, and (2) whether the shipowner had knowledge or privity of these acts.

Christensen's navigation was one cause of the collision. Ocean Foods makes two arguments against any privity or fault concerning Christensen's navigation.

#### 1. Navigational Errors

Ocean Foods' first argument is that the accident occurred from the spontaneous navigational negligence of the master and crew, and the owner is not in privity with that type of fault because the owner cannot control the vessel at sea. *Waterman Steamship Corporation v. Gay Cottons*, 414 F.2d 724, 732 (9th Cir.1969).

■ Navigational error can result from the simple mistake of a well-trained and experienced seaman, or from the incompetence of the crew. At some point a

návigational error is so gross that it is attributable to the navigator's incompetence. *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1577 (11th Cir.1985). The owner can be charged with privity when it fails to train its crew, or fails to make the proper inquiries as to the crew's navigational competence. *Id.*

■ Christensen testified that he was not familiar with the International Regulations for Preventing Collisions at Sea.[4] In addition, he did not recognize that when two vessels have a constant bearing, and the distance closes, that the vessels are on a collision course. The expert witnesses testified, and I agree, that a working knowledge of the rules of the road, and the constant bearing rule, is so fundamental that a deckhand on a fishing vessel lacking such knowledge is incompetent to navigate the vessel. *See* Rule 7(d)(i). Christensen's incompetence is borne out by the facts. He watched the TOSCA for six miles as the bearing held constant, and the distance closed, until the TOSCA cut the McKINLEY in two. He did nothing to avoid the collision until it was too late. A competent seaman would have recognized the risk of collision and taken the appropriate action under the rules to avoid it.

2. Duty to Hire a Competent Crew

Ocean Foods' second argument is that it delegated the hiring of the crew to a competent master and, therefore, it cannot be held responsible for the master's negligence in hiring Christensen.

■ A vessel owner has a duty to supply an adequate and competent crew for the vessel's intended voyage. *Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204, 210 (5th Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968); *Admiral Towing Company v. Woolen*, 290 F.2d 641, 646 (9th Cir.1961); *In Re Pacific Mail S.S. Co.*, 130 F. 76, 82–83 (9th Cir.), *cert. denied*, 195 U.S. 632, 25 S.Ct. 790, 49 L.Ed.

353 (1904). The crew must "not merely be competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen." *Pacific Mail*, 130 F. at 82.

■ The corporate owner also has a responsibility to exercise "reasonable diligence" to insure that the master operates the vessel according to instructions. *Spencer Kellogg Co. v. Hicks*, 285 U.S. 502, 512, 52 S.Ct. 450, 453, 76 L.Ed. 903 (1932) (*The LINSEED KING*). In *Admiral Towing* the court of appeals held that a corporate shipowner must do more than just instruct the master to hire a competent deckhand. Depending on the circumstances the owner may have a duty to assure itself that the master actually hired a competent deckhand. *Admiral Towing*, 290 F.2d at 648–49. A corporate owner may not close its eyes to what a prudent inspection would show. "If lack of actual knowledge were enough, imbecility, real or assumed, on the part of the owner would be at a premium." *Waterman Steamship Corp.*, 414 F.2d at 732. "Privity and knowledge exist where the owner has actual knowledge, or could have and should have obtained the necessary information by reasonable inspection." T. Schoenbaum, *Admiralty and Maritime Law*, 14.6 (West 1987). *Accord Complaint of Patton–Tully Transp. Co.*, 797 F.2d 206, 211–12 (5th Cir.1986).

■ The question under the instant facts is whether the owner could simply tell the master to hire the crew and leave it at that. The *LINSEED KING* is instructive on this point. The *LINSEED KING* involved a launch that carried workers a short distance across the Hudson River to the owner's factory. The Court distinguished the negligence of the LINSEED KING's master from that of a master on an ocean-going ship where "there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. The latter must rely

---

4. In the fishing industry, the regulations are referred to variously as, the international rules, the rules of the road, collision regulations, or Col.Regs. The regulations are codified at 33 U.S.C. foll. § 1602. Hereinafter all references to the specific rules refer to the international rules. The international rules apply to the situs of this collision. Rule 1(a).

upon the master's obeying rules and using reasonable judgment." *The LINSEED KING*, 285 U.S. at 511–12, 52 S.Ct. at 453. The McKINLEY was in port every three days. The boat moored less than twenty feet from the Ocean Foods office. Ocean Foods' vice president, Bill Elder, stated that he could see the McKINLEY from his office window. Furthermore, when the McKINLEY was at sea it communicated with Ocean Foods on its daily 15:00 radio schedule. It was a simple matter for the managers to ensure that Parker hired competent deckhands.

Ocean Foods Boat Company, Inc. had three officers and three employees, the McKINLEY's crew members. Bill Elder is the corporate vice president and he was the McKINLEY's manager. He is sufficiently high in the corporate structure that his knowledge is that of the corporation. *See Patton–Tully*, 797 F.2d at 211–12. He testified that complete authority was delegated to Parker to hire the crew and that Parker could hire whomever he wanted. He also stated that he never set any guidelines or imposed any standards on the deckhands' ability. Ocean Foods established no procedures for hiring replacement crew members, and Elder never told Parker that the corporation wanted him to hire competent deckhands. At the time of the collision he did not even know that Christensen was aboard the McKINLEY. In short, he did nothing to ensure that the McKINLEY sailed with a competent crew. Captain Parker testified that when one of the regular deckhands wanted time off it was the deckhand's duty to find a replacement who could do the job. Mr. Owen, the McKINLEY's regular deckhand found Christensen. Consequently, the duty of finding a competent deckhand was twice delegated, and that is how Christensen was hired.

Ocean Foods called Robert Jacobson to testify as an expert witness. He stated that the custom in the fishing industry is to delegate the hiring and training of the crew to the master. Jacobson's credentials are impressive but his testimony was not. Custom is relevant but the question of the owner's duty is one of law because, as has been said before, the entire industry can be operating negligently. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1156–58 (2d Cir.1978) (the court finds the pilot incompetent, rejects the industry standard, and denies limitation), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979)[5]. It may be proper to delegate the *selection* of the crew to the master *if* the owner ensures that the master hires a professionally competent crew.

Fishing is a demanding and hazardous business. The McKINLEY navigated the Washington coast and the Columbia River. The corporate managers knew that it would meet many vessels in these congested waters. Ocean Foods should have insured that the deckhands who navigated the McKINLEY were competent. If Ocean Foods could not find a competent deckhand, it then had two options. It could have trained the replacement deckhand as it trained Captain Parker before he assumed his duties. Or it could have tied the boat up until it once again had a full and competent crew.

Bill Elder did nothing to fulfill the corporate owner's responsibility to ensure that the boat sailed with a competent crew. A simple inquiry would have disclosed Christensen's incompetence. Therefore, Ocean Foods is deemed to have knowledge of the negligence and unseaworthiness that lead to the collision because the corporate managers did not exercise reasonable diligence to provide a competent crew. *See The LINSEED KING*, 285 U.S. at 512, 52 S.Ct. at 453; *Patton–Tully*, 797 F.2d at 212; *Hercules Carriers*, 768 F.2d at 1576; *Tug Ocean Prince*, 548 F.2d at 1156; *Admiral Towing*, 290 F.2d at 648–49; G. Gilmore and C. Black, *The Law of Admiralty*, 10–

**5.** In recent years safety standards in the fishing industry have come under increasing public scrutiny. A 1987 report by the National Transportation Safety Board rates the American commercial fishing industry as one of the most risky in the world. The fishing industry has the poorest safety record of any industry in the nation. S. Gilmore, *Hostile Sea,* Seattle Times, Dec. 20, 1987, at B 3. For example, the Alaskan fishing industry alone has claimed 103 lives in six years. *Id.*

24 at 894 (2nd Ed.1975). Ocean Foods' petition for limitation of liability is denied.

## B. THE FAULT OF THE TOSCA AND McKINLEY

From the beginning of this action the TOSCA has maintained that it was not at fault for the collision. Its main factual contentions at trial were that the McKIN-LEY violated the rules of the road, did not have running lights, and made a poor radar contact because it did not carry a radar reflector. Ocean Foods has suggested that fault be apportioned evenly because the TOSCA failed to determine that a risk of collision existed, and failed to take the appropriate action to avoid the collision. *See Shaun Fisheries Limitation Proceedings,* 1984 AMC 2650 (D.Or.1984) [available on WESTLAW, 1983 WL 699].

### 1. The Vessels' Courses

Both sides offered expert testimony concerning the respective courses of the two vessels. The McKINLEY's theory is that the two vessels were in a meeting situation governed by Rule 14. The TOS-CA argues that the vessels were in a crossing situation and that it was the stand-on vessel under Rule 15. Rule 15 provides: "When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel."

The TOSCA's course recorder demonstrated that her course varied from 342 to 348 degrees true. Her intended track, as laid out by her Captain on the navigation chart used on the bridge that night, was 345 degrees true. TOSCA's Trial Exhibit 103. Parker testified that he did not remember his exact course towards the buoy at the mouth of the river. Christensen testified that the course to the buoy was 125 degrees magnetic. The chart shows a variation of 20 degrees East for magnetic North which, when added to the magnetic course, gives a true course of 145 degrees.

The difference between the two vessels' courses varied from 17 degrees to 23 degrees. A point on the compass is 11 and ¼ degrees. The general rule is that the difference of one point or more is to be treated as a crossing situation, and differences under one point are to be treated as a head-on situation. Bassett and Smith, *Farwell's Rules of the Nautical Road,* at 212 (6th Ed.1982) (hereinafter *Farwell's Rules* ) (TOSCA's Exhibit Number 168). The difference in the courses varied from one and a half to two points. The vessels were crossing. *See The Edwin Slick,* 286 F. 43, 47 (6th Cir.1923); *The Corozal,* 62 F.Supp. 123, 125 (S.D.N.Y.1944).

### 2. Obligations in a Crossing Situation

The McKINLEY was the give-way vessel because she had the TOSCA on her starboard side. Rule 15. As the give-way vessel she is bound to take early and substantial action to keep well clear. Rule 16. The action is required to be positive, made in ample time, and in accordance with good seamanship. Rule 8. Additionally, as the give-way vessel in a crossing situation she should have avoided crossing ahead of the TOSCA. Rule 15. "Thus, the timely options available to the give-way vessel [in crossing] are to keep out of the way by altering course to starboard, to slacken speed or stop or reverse, or to alter to port sufficiently to avoid passing ahead." *Farwell's Rules,* at 256.

The TOSCA was the stand-on vessel. Under Rule 17(a)(i) she is required to keep her course and speed. However she may "take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules." Rule 17(a)(ii). When the stand-on vessel finds "herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision." Rule 17(b).

Christensen testified that he watched the TOSCA for six miles as the bearing remained constant and the distance closed. He also testified that he was try-

ing to pass starboard to starboard. Because of the vessels' courses, this maneuver required the McKINLEY to cross ahead of the TOSCA. As the give-way vessel the McKINLEY violated Rule 15 and 16 when it crossed in front of the TOSCA in such close quarters, and failed to keep out of TOSCA's way.

Rule 17 allowed the TOSCA to take unilateral action to avoid the collision once it became apparent that the McKINLEY was not following the rules, and that the TOSCA's maneuver was necessary to avoid collision. The TOSCA failed to take such action. She must accept some responsibility for the collision.

### 3. Risk of Collision

Rule 7 required both vessels to use all available means to determine if a risk of collision existed. Rule 8 requires that any action taken to avoid collision be positive, made in ample time, and with due regard to the observance of good seamanship.

The McKINLEY failed to appreciate that a risk of collision existed because the only person on watch was totally incompetent. This failure violated Rule 7. The McKINLEY also violated Rule 5 which requires a proper lookout, because an incompetent lookout does not satisfy the rule. *Complaint of Interstate Towing Co.*, 717 F.2d 752, 755 (2d Cir.1983). Parker's actions after Christensen called him to the wheel house were taken *in extremis*, and were inadequate to avert the collision. The McKINLEY violated Rule 8 when it failed to take action to avoid collision until the TOSCA was 300 yards away.

Much of the trial concerned the mate's and the lookout's use of the TOSCA's radar. Both testified that they saw a weak radar target about three miles off the port bow, eight minutes before the collision. After the collision, they concluded that the McKINLEY was the weak target that they had seen. The parties strenuously contested whether the McKINLEY carried a radar reflector. A wooden boat makes merely a fair radar target. The McKINLEY had a steel mast and metal drums on the aft deck used for fishing. This metal made the McKINLEY a good radar target. I also find credible Parker's and Owen's testimony that shortly before the accident Hellberg installed a radar reflector on the McKINLEY's mast. The radar reflector doubled the return the McKINLEY would make on a properly adjusted radar.

Ocean Foods called John Carlile as an expert witness. He is the manager of Sperry Marine's radar test and repair facility. Prior to joining Sperry he served for 25 years in the United States Coast Guard, achieving the rank of commander. He has spent much time at sea. He testified that the TOSCA's radar should have picked up the McKINLEY from the time it came within range until just before the collision. While serving in the Coast Guard he had to find disabled wooden fishing vessels off the Washington and Oregon coasts at night and in bad weather. The vessels had often lost power and were not burning their navigation lights. He routinely used his vessel's radar to find these disabled vessels. Carlile also testified that modern radars provide a computer enhanced picture which distinguishes wood from water.

The TOSCA's expert witness, Captain Hilliard Lubin, testified that TOSCA's radar only picked up the McKINLEY for two minutes. He testified that the sea clutter on the TOSCA's radar repeater extended from the TOSCA out three miles. He further assumed that the McKINLEY was a poor radar target, and that it would not have shown up on the TOSCA's radar until it came within four miles of the TOSCA. The vessels were closing at 26 knots, therefore the McKINLEY would have only appeared on the radar for about two minutes before entering the sea clutter. He testified that there is no requirement for a constant radar watch, and it was entirely reasonable for the mate to be attending to other duties during this time.

I credit Mr. Carlile's testimony and I find Captain Lubin's testimony unconvincing. The experts substantially agreed that the TOSCA's radar should have detected the McKINLEY. I find that Dirland failed to observe the McKINLEY on radar for two

reasons. First, that a member of TOSCA's crew misadjusted the sea clutter control and the gain control which diminished the McKINLEY's normal radar return. Second, that Dirland and Andersson failed to watch the radar as closely as they should have. This failure to effectively use the TOSCA's sophisticated computer-assisted radar to determine if a risk of collision existed violates Rule 7(b). *Trinidad Corp. v. S.S. Keiyoh Maru,* 845 F.2d 818, 826 (9th Cir.1988); *Williamson Leasing v. American Commercial Lines,* 616 F.Supp. 1330, 1340 (E.D.La.1985).

▮ The TOSCA contends that the McKINLEY did not show its navigation lights because they were not turned on. Captain Parker testified that he told Hellberg to turn the lights on before he went to sleep, and that he heard Hellberg turn on the lights. Christensen testified that he saw the starboard light burning before the collision. Parker testified that just before he jumped overboard he noticed that the McKINLEY's mast head light burning. Dirland and Andersson, however, both testified that the McKINLEY did not have its navigation lights on. The testimony is in direct conflict, but I credit Parker's version. I find that the McKINLEY's lights were on.

TOSCA failed to see McKINLEY's lights, in part, because neither the mate nor the lookout went out on the bridge wing to scan with their binoculars. Going on deck eliminates one layer of glass between the lookout and the ocean. It also eliminates any reflection off the windows from the lights in the bridge area. Once the crew picked up the weak target they should have used every available means to determine if a risk of collision existed. This included adjusting the radar and going on the bridge wing to scan the ocean. They did neither. Carlile testified that based on the visibility and the sea state, the TOSCA should have spotted the McKINLEY's lights. I agree. The failure to see the McKINLEY violated Rule 5 because the TOSCA failed to keep a proper lookout. *See Farwell's Rules,* at 352.

### 4. The *Pennsylvania* Rule

Ocean Foods and Hellberg proved by a preponderance of the evidence that the TOSCA did not effectively use her radar in violation of Rule 7(b), and failed to see the McKINLEY's lights in violation of Rule 5. In addition they proved that the TOSCA violated Rules 8 and 17 because she took no action to avoid the collision until it was futile. These statutory violations caused the accident.

The TOSCA and Hellberg proved that the McKINLEY violated Rule 5 for failing to keep a proper lookout; Rule 7 for failing to determine if a risk of collision existed; Rule 8 for failing to take action to avoid the collision; and Rules 15 and 16 for failure to give way in a crossing situation. In addition Christensen violated Rule 2 because he did not comply with the ordinary practices of seamen.

▮ The vessels' respective statutory violations invoke the *Pennsylvania* rule. *See Trinidad Corp. v. S.S. Keiyoh Maru,* 845 F.2d at 826 (improper lookout, and failure to effectively use radar). Therefore, the burden shifted to the vessels to prove that their fault could not have been a cause of the collision. *The Steamship Pennsylvania v. Troop,* 86 U.S. (19 Wall.) 125, 148, 22 L.Ed. 148 (1873). The burden imposed under this rule is discharged by a clear and convincing showing that the vessel's statutory violation did not proximately cause the accident. *Trinidad Corp.,* 845 F.2d at 825. The parties failed to produce any evidence that I found probative that their statutory fault did not contribute to the accident. Moreover, the parties proved, independent of the *Pennsylvania* rule, that both vessels' statutory violations combined to cause the accident. The next step is to apportion the fault.

### 5. Apportionment of Fault

Collision liability is based on fault. Negligence must be shown before liability is imposed. *Bernert Towboat Co. v. USS Chandler (DDG 996),* 666 F.Supp. 1454, 1457, 1987 AMC 2919, 2921 (D.Or.1987). The standard of care in collision cases is provided by the concept of reasonable care,

specific statutory provisions, and by the requirements of good seamanship. *Id.*

In a maritime collision, liability is allocated among the parties proportionately to the comparative degree of their fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). Liability is apportioned on the basis of the relative culpability of the parties' actions, rather than their respective degrees of physical causation. *Complaint of Seiriki Kisen Kaisha,* 629 F.Supp. 1374, 1381 n. 3 (S.D.N.Y.1986); *Cumberland County Utilities Authority v. M/T Delbar,* 604 F.Supp. 383, 389 (D.N. J.1985).

Christensen's wholly incompetent navigation was a legal cause of the accident. The McKINLEY violated several rules of the road. The TOSCA's crew failed to effectively use its sophisticated radar, and failed to keep a proper lookout. Moreover, the TOSCA continued on its course at 20 knots after Dirland spotted a weak target on the radar repeater. He should have slowed and called the captain to the bridge to determine what was ahead of the TOSCA. I find the McKINLEY 65% at fault and the TOSCA 35% at fault for the collision.

## C. THE VESSELS' LIABILITY FOR HELLBERG'S DEATH

Hellberg was a Jones Act seaman. The plaintiff asserted wrongful death claims against Ocean Foods for negligence under the Jones Act, 46 U.S.C.App. § 688, and for unseaworthiness under the Death on the High Seas Act, 46 U.S.C.App. § 761 et seq. (DOHSA).

The McKINLEY was unseaworthy in three respects. The eye in the line tying Hellberg to the Kanio life ring pulled out while he was lifted and Hellberg fell back into the ocean. A seaworthy eye would not have pulled out. The McKINLEY's inflatable life raft did not deploy. If it had deployed the men would not have awaited rescue submerged in 50 degree water. Last, the McKINLEY sailed with an incompetent crew.

Ocean Foods also was negligent in two ways. It negligently hired Christensen, and then allowed him to stand watch alone. In addition, under the Jones Act, Ocean Foods is directly responsible to Hellberg for Christensen's negligent navigation. *See Holland v. Allied Structural Steel Co., Inc.,* 539 F.2d 476, 479 (5th Cir. 1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977). Ocean Foods' negligence and the McKINLEY's unseaworthiness were substantial factors contributing to Hellberg's death.

The plaintiff sued the TOSCA under DOHSA. As discussed above the TOSCA's crew negligently operated her in violation of several rules of the road. This negligence was a substantial factor contributing to the collision and Hellberg's death. The defendants are jointly and severally liable to plaintiff in the amount of damages already determined. *JOIA v. JO-JA Service Corp.,* 817 F.2d 908, 918 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

## D. THE McKINLEY's VALUE

Ocean Foods and its insurers seek recovery for the value of the McKINLEY from the TOSCA. The market value of the vessel at the time of the accident is the measure of damages. *Alkmeon Naviera, S.A. v. M/V Marina L,* 633 F.2d 789, 797 (9th Cir.1980). Ocean Foods seeks the market value of the vessel and the value of the fish that were in the hold.

The McKINLEY was insured for $180,-000.00. Forrest Siemroth, a marine surveyor, set the McKINLEY's fair market value at $225,000.00 to $250,000.00. I find that the McKINLEY was not insured for her full value. The fishing off the Washington coast improved in 1986 which in turn increased boat prices. Ocean Foods spent a good deal on maintenance to keep the boat in good condition. The McKINLEY's fair market value at the time of the accident was $225,000.00. Ocean Foods is also entitled to recover $4,100.00 for the fish in the McKINLEY's hold. The total damages are $229,100.00, which will be reduced by

the percentage of Ocean Foods comparative fault. Ocean Foods is also entitled to prejudgment interest. *Vance v. American Hawaii Cruises, Inc.,* 789 F.2d 790, 795 (9th Cir.1986).

CONCLUSION

Ocean Foods' petition for limitation of liability is denied. The McKINLEY is 65% at fault for the collision and the TOSCA is 35% at fault. Both defendants are liable to the plaintiff for the wrongful death of Edward Hellberg. The loss to Ocean Foods is $229,100.00 which will be reduced for comparative negligence. The TOSCA's claims for contribution are reserved for subsequent disposition. Counsel for Hellberg will prepare and submit to the court the appropriate judgment.

The foregoing constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).