345 F.2d 451
 Cecilia Bisso SLATEN, Executrix of the Estate of W. A.
Bisso, Sr., Appellant,
v.
HOPEMOUNT SHIPPING CO., Ltd., M.S. HOPERANGE, Moran Towing
and Transportation Co., Inc., and the TUG JULIA C.
MORAN, Appellees.
HOPEMOUNT SHIPPING COMPANY, Ltd., Claimant of the M.S.
Hoperange, and Moran Towing & Transportation
Company, Inc., Appellants,
v.
TUG W. A. BISSO, and its Claimant, Cecilia Bisso Slaten,
Executrix of the Estate of W. A. Bisso, Sr., Appellees.
 No. 21627.
 United States Court of Appeals Fifth Circuit.
 May 13, 1965.
 
 Charles E. Dunbar, III, Harry S. Redmon, Jr., New Orleans, La., for Mrs. Cecelia Bisso, Slaten, Testamentary Ex'x of Estate of W. A. Bisso, Sr., appellant, Jas. Hy. Bruns, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.
 Eugene Underwood, New York City, Walter Carroll, Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., and Burlingham Underwood Barron Wright & White, New York City, for appellees and cross-appellants, Robert B. Pohl, New York City, Rufus C. Harris, Jr., New Orleans, La., of counsel.
 Before WOODBURY,[1] JONES and GEWIN, Circuit Judges.
 WOODBURY, Senior Circuit Judge.
 
 
 1
 As this case comes to us, after libels, cross-libels, a petition for limitation of liability and settlements, the issue presented is whether there is sufficient evidence in the record to warrant the finding of the court below that the tug W. A. BISSO was solely at fault and not entitled to limitation of liability for the stranding of the British Motor vessel HOPERANGE near the entrance to Southwest Pass.
 
 
 2
 The HOPERANGE was disabled in the Pacific Ocean off the Panama Canal by a devastating fire in her engine room. After the fire was put out she was towed back to the canal, temporarily repaired and picked up as a 'dead' ship, i.e., one having no power on board, at Cristobal by the tug JULIA C. MORAN to be towed to Galveston. The starboard anchor of the HOPERANGE was unshackled and laid on deck and the tug's towing cable was shackled to the anchor chain in its place. On route to Galveston the tow was diverted to New Orleans.
 
 
 3
 The tow arrived off the mouth of Southwest Pass on the morning of May 13, 1957. Pilots went on board both vessels and the tug W. A. BISSO arrived from New Orleans by prearrangement to assist in bringing the HOPERANGE up the river. At the direction of the captain of the JULIA C. MORAN and the pilot on board that vessel, who were in overall charge, the BISSO made fast to the port quarter of the HOPERANGE and the flotilla headed for the Pass. Before entering it, however, the BISSO's lines parted and the HOPERANGE was turned out to sea. The pilots decided that it was unsafe to attempt to negotiate the pass under existing conditions and went ashore to telephone for permission to proceed to another port. The evidence is not clear as to whether the pilots considered the danger insurmountable because of wind, sea and current conditions (the river was at the 14 foot stage with a current of about five knots) or whether they thought passage could be safely attempted with the assistance of another tug. In any event permission to proceed to another port was refused and the tug HUMRICK was dispatched to assist in the operation.
 
 
 4
 Before it arrived a second attempt was made to enter the Pass. This time the W. A. BISSO, the more powerful tug, was stationed ahead on the towing hawser and the JULIA C. MORAN was stationed behind the HOPERANGE to assist in steering the vessel. This attempt failed because of the parting of the bridle on the W. A. BISSO to which the towing hawser was attached. Again the HOPERANGE was turned out to sea and soon thereafter the HUMRICK arrived and a third attempt was made to enter the Pass.
 
 
 5
 This time the JULIA C. MORAN was ahead on the towing hawser and the other two tugs on the HOPERANGE's quarters, the W. A. BISSO on the port side and the HUMRICK on the starboard side. As the flotilla approached the Pass the BISSO's lines again parted and when they did the HOPERANGE took a sheer to port and within two to five minutes stranded hard and fast on a large sand bar on the west side of the entrance to the Pass.
 
 
 6
 The court below after full hearing found that 'the stranding resulted from the BISSO's breaking away from the HOPERANGE which allowed the vessel to sheer to port and run aground,' that the reason for the BISSO's breaking away was that her 'wires were not adequate for the task' and that her owner was not entitled to limitation of liability because there 'was no regular maintenance and inspection' of her cables. The appellant challenges these findings as clearly erroneous and predicts dire consequences to the law of admiralty unless they are set aside.
 
 
 7
 We definitely do not agree, Indeed we find no occasion for a detailed statement and analysis of the appellant's various contentions and the evidence on which her counsel relies. Two matters only call for specific comment. (1) Even if the HOPERANGE's starboard anchor had been rigged and was ready for use, and even if there had been time to drop it between the time when the BISSO broke loose and the stranding, still there is no conclusive testimony that the anchor could have embedded itself in the silt at the bottom of the channel in season to prevent or even to minimize the stranding. It cannot be said with any certainty that lack of a starboard anchor on the HOPERANGE was causal. (2) We see no error in the failure of the court below to give conclusive effect to a certain entry in the HOPERANGE's log book. The entry lends some credence to the appellant's contention that the BISSO's lines parted because of adverse sea conditions and the contention is that Moran is bound by the entry as the assignee of HOPERANGE's claim against BISSO. In the first place, as the court below pointed out, the time when the entry in the log was made is not entirely clear. It cannot be told with certainty whether the entry referred to sea conditions before the stranding or after that event. In the second place, although log entries are certainly evidence, and cogent evidence if adverse to interest, we are aware of no persuasive authority or sound reason for making log entries gospel.
 
 
 8
 Aside from these comments it will suffice to say that there is ample evidence in the record to support the findings of the District Court. We cannot say that the findings are clearly erroneous. Even less can we say that we are left with the definite and firm conviction that a mistake has been committed. Wherefore the judgment below may not be set aside. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).
 
 
 9
 Moran's appeal is from the failure of the court below to decree liability against the BISSO's surety. We think it has merit.
 
 
 10
 The purpose of the bond given by the claimant of the W. A. BISSO was, of course, to release the vessel then being held under admiralty process. It took the place of the vessel as security for any decree which might later be entered against it. 'Had the vessel not been released execution on the decree subsequently rendered would have run against the vessel. By the terms of the stipulation the claimant and his surety consented and agreed that the execution might run against their goods, chattels and lands, instead of against the vessel.' Elliot v. Lombard, 292 U.S. 139, 142, 54 S.Ct. 637, 638, 78 L.Ed. 1175 (1934). The interlocutory decree should be amended to decree recovery against the surety on the BISSO's bond.
 
 
 11
 Affirmed on the merits but remanded for modification of the decree to declare the liability of the BISSO's surety.
 
 
 
 [1]
 Senior Judge of the First Circuit, sitting by designation