IN the Matter of ESTA LATER CHARTERS, INC., a former owner of the Kadena de Amor, for Exoneration from or Limitation of Liability, and Fireman's Fund Insurance Co., Petitioners–Appellants,

v.

James IGNACIO, Jr. and Steven Charfauros Manley, Claimants–Appellees.

Nos. 88–2728, 88–2730.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1989

Decided May 17, 1989.

See also, 9th Cir., 860 F.2d 353.

---

David A. Mair, Mair, Mair, Hogan & Spade, Daniel R. Del Priore, Agana, Guam, for petitioners-appellants.

Margaret E. Bean, McCully, Swavely & Lannen, Robert L. Keogh, Keogh & Butler, Agana, Guam, for claimants-appellees.

Before BROWNING, BEEZER and KOZINSKI, Circuit Judges.

---

KOZINSKI, Circuit Judge:

Shortly after the close of the middle ages, many European seafaring nations developed a rule of maritime law that limited a shipowner's liability to the value of the vessel and its cargo.[1] The rule was first adopted in the United States in the Limitation of Liability Act of 1851, Act of March 3, 1851, 9 Stat. 635, codified at R.S. § 4283 *et seq.*, and has remained part of U.S. law to this day, a vestige of a time gone by. In this case, we must determine how soon a shipowner must file a petition seeking the protections of the Act in cases where more than one claim arises from the same incident.

## Facts

On September 27, 1985, two workmen, James Ignacio, Jr. and Steven Charfauros Manley, were painting the Kadena de Amor, a commercial tour boat owned by Esta Later Charters, Inc. (Esta Later). An explosion erupted, killing Manley and badly injuring Ignacio.

On October 24, 1985, for $5,000, Manley's parents signed a document purporting to release Esta Later from all liability. Almost two years later, on September 16, 1987, Manley's parents filed a complaint for the wrongful death of their son in the Superior Court of Guam against Fireman's Fund (Esta Later's insurer), Esta Later and Esta Later's Board of Directors.

Unlike the Manleys, neither James Ignacio nor his wife and children ever signed a release. Counsel for the Ignacios sent a written claim for $1 million to Fireman's on December 20, 1985. Fireman's did not respond. On April 8, 1986, the Ignacios filed an action for over $2.5 million in superior court against Esta Later and Fireman's Fund. Two amended complaints were filed. The second, filed on September 25, 1987, added a new plaintiff, Richard Ignacio, who was conceived and born after the accident.

On December 17, 1987, less than six months after the Manleys filed their first complaint and the Ignacios filed their second amended complaint adding Richard, Esta Later first filed a petition to limit liability under 46 U.S.C.App. § 185 (Supp. IV 1986) in the District Court of Guam. The district court promptly stayed all pending proceedings against Esta Later arising out of the accident, and directed that any claims arising from the accident be filed in the federal proceedings.

The Ignacios and Manleys moved to dismiss Esta Later's petition as untimely, not having been filed within six months of the Ignacios' December 20, 1985, demand letter to Fireman's or the April 8, 1986, superior court complaint. The district court agreed. Ruling that written notice of a claim by one claimant starts the six month period running as to all potential claimants, the court granted the motion to dismiss. Esta Later and Fireman's appeal.

## Contentions

Although Esta Later and Fireman's concede that their petition for limitation of liability is untimely as to the Ignacios' initial complaint, they argue that the six month limitation is triggered anew by each new claim. Because the petition was filed within six months of receiving notice of Richard Ignacio's and the Manleys' claim, appellants contend that the district court had jurisdiction over these claimants. Appellants further contend that even if the filing of a single claim triggers the six-month period as to all claims, the Manleys are equitably estopped from asserting the six month period against Esta Later.

## Discussion

### I

No one who has had occasion to study the Limitation of Liability Act has been

---

**1.** The rationale for this rule was explained by Grotius in 1625: "[M]en would be deterred from employing ships, if they lay under the perpetual fear of being answerable for the acts of their masters to an unlimited extent.... [This would not be] conducive to the public good." H. Grotius, *De Jure Belli ac Pacis* 139 (1625) (Campbell transl. 1901), quoted in Eyer, *Shipowners' Limitation of Liability—New Directions for an Old Doctrine,* 16 Stan.L.Rev. 370, 371 (1964).

struck by its lucidity.[2] As noted by one commentator, "[i]n seven ill-worded sections designed to conform to English law, the Thirty-first Congress laid the foundations of the American system of limitation that exists today." Eyer, note 1 *supra*, at 372 (footnotes omitted). The Act's central provision, 46 U.S.C. § 183(a), states the general rule that a shipowner may limit his liability for any damage or loss to the value of his interest in the ship and its freight.[3] Subsections 183(b)-(f) limit this general rule where the accident has resulted in loss of life or bodily injury.[4] Section 185 establishes the mechanism for limiting liability: After invoking the jurisdiction of the federal court by filing a section 185 petition, the shipowner must either pay into court the value of the vessel and freight or transfer his interest in these to a trustee appointed by the court. "Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease." 46 U.S.C. § 185. Pursuant to this provision, admiralty courts issue a restraining order or an injunction staying all proceedings pending elsewhere. *See* Fed.R.Civ.P.Supp. Rule F(3); *Jung Hyun Sook v. Great Pac.*

*Shipping Co.*, 632 F.2d 100, 103 (9th Cir. 1980); *see generally* G. Gilmore & C. Black, note 2 *supra*, § 10–16, at 863.[5]

Claimants must then file their claims in the court which has taken jurisdiction of the petition to limit liability. Fed.R.Civ.P. Supp.Rule F(4). As originally enacted in 1851, the Act contained no deadline for filing petitions pursuant to section 185. *See* 3 A. Jenner & J. Loo, *Benedict on Admiralty* § 2, at 1–19 (7th ed. 1988). Courts therefore allowed shipowners to petition for limitation of liability at any time, even after entry of judgment. *See Jung Hyun Sook v. Great Pacific Shipping Co.*, 632 F.2d at 103; *In re Goulandris*, 140 F.2d 780, 781 (2d Cir.), *cert. denied*, 322 U.S. 755, 64 S.Ct. 1268, 88 L.Ed. 1584 (1944). A 1936 amendment added the preamble of the current statute, which states: "The vessel owner, *within six months* after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of competent jurisdiction for limitation of liability." Act of June 5, 1936, Pub.L. No. 662, 49 Stat. 1479 (revising R.S. § 4283 *et seq.* as amended) (emphasis added).

**2.** A contemporary commentator complained: "The provisions of this act are of paramount importance to the mercantile community, though the main object of the act has been frustrated by the neglect on the part of its framers to embody this intent in intelligible language." 2 Parsons, *Shipping & Admiralty* 120 (1869), *quoted in* G. Gilmore & C. Black, *The Law of Admiralty* § 10–2, at 819 n. 6. (2d ed. 1975). The case of *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 20 L.Ed. 585 (1871), the first major litigation under the Act,

brought home to the members of the Court the fact that the Act of 1851 was so imperfect, fragmentary and ambiguous as to be unworkable.... [Consequently] the Court resorted to the extraordinary device of supplementing the statute by rules of court, which were issued in 1872, the year following the decision in the Wright case; the Admiralty rules on limitation, subsequently several times revised, have continued to play an important role in limitation litigation.

G. Gilmore & C. Black, § 10–2 *supra*, at 819–20 (footnote omitted).

**3.** The value of the ship and freight is assessed after the damage or loss has taken place. *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 122, 20 L.Ed. 585 (1871).

**4.** In the case of a seagoing vessel, an owner cannot limit liability for loss of life or bodily injury to an amount less than $420 times the vessel's tonnage. 46 U.S.C. § 183(b). However, for purposes of section 183(b), the term "seagoing vessel" does not include "pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels or their tenders, self-propelled lighters, non-descript self-propelled vessels, canal boats, scows, car floats, barges, lighters, or nondescript non-self-propelled vessels." 46 U.S.C. § 183(f).

**5.** A district court normally has broad discretion in deciding whether to dissolve the injunction and allow claimants to proceed against the shipowner in other courts. *Newton v. Shipman*, 718 F.2d 959, 961 (9th Cir.1983); *Helena Marine Serv., Inc. v. Sioux City*, 564 F.2d 15, 17 (8th Cir.1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978). However, the Supreme Court has held that a court abuses its discretion in refusing to dissolve a stay if there is only one claim, *Langnes v. Green*, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931), or if the aggregate of all claims is less than the limitation fund, *Lake Tankers Corp. v. Henn*, 354 U.S. 147, 77 S.Ct. 1269, 1 L.Ed.2d 1246 (1957).

Drafted with the same meticulousness as the original statute, the 1936 amendment failed to address the question presented to us today, namely whether the six-month limitation period for filing a petition runs only once, immediately after the first claim, or whether a new six-month period begins to run after every new claim is presented to the shipowner. The relevant statutory language provides absolutely no help; it can fairly be read to support either position. Section 185 could easily be interpreted as providing that a vessel owner has a single six-month period to file a petition in district court, and the triggering event for the commencement of the six-month period is the presentation of *a* claim. But it would not strain the statutory language at all if we were to read it as providing that the presentation of *any* claim gives rise to a six-month filing period, with successive filing periods available if there are multiple claims. Not only is either interpretation plausible, but each is equally plausible as a matter of language, grammar and syntax.

More than half a century ago, shortly after the passage of the 1936 amendments to the Liability Act, Judge Leibell of the Southern District of New York had occasion to ponder the same question we do today. *The Grasselli Chemical Co. No. 4,* 20 F.Supp. 394 (S.D.N.Y.1937). He solved the puzzle by noting that, once a petition is filed under section 185, "all claims and proceedings against the owner with respect to the matter in question shall cease," and be brought into the limitation proceeding. Judge Leibell inferred from this provision that Congress had meant to give shipowners only a single opportunity to institute a limitation of liability proceeding. A contrary construction, Judge Leibell reasoned, would mean that early claims would be exposed repeatedly to risks of disruption because every new claim would entitle the shipowner to bring *all* pending claims into the limitation proceedings. *The Grasselli* has been followed in the only other case that has considered the issue. *See In re United States Lines, Inc.,* 616 F.Supp. 315 (S.D.N.Y.1985). Otherwise the issue has remained unexamined by the judicial eye.

## II

In attacking the district court's judgment, which relied on the *Grasselli* rationale, Esta Later points out that commentators have criticized the *Grasselli* rule as a "most unlikely construction" of the statute, G. Gilmore & C. Black note 2 *supra,* § 10.15, at 861 n. 65, and as unnecessarily literal, *Benedict on Admiralty,* p. 236 *supra,* § 15, at 2–18. Esta Later also argues that this construction of the statute could have draconian effects. The owner of a large ship presented with a small claim would face a serious dilemma: It could immediately commence a limitation proceeding, incurring the disruption attendant to placing the ship within the custody of the district court or the expense of posting a bond for its value. Or, it could forego bringing a limitation proceeding in district court within six months, and thereby risk losing the protection of the Act if a much larger claim is filed later on. Appellees, naturally, point to the longevity of the *Grasselli* rule and urge us to leave well enough alone.

## III

As noted, the Limitation of Liability Act is unlikely to serve as a model of legislative draftsmanship. Because the question presented to us seems not to have been contemplated by the legislative drafters, we are now asked to distill more from the statute than Congress put into it. While we see no compelling reason for adopting either of the two possible interpretations, we have determined that the most prudent—and appropriate—course is to follow the rule adopted in *The Grasselli*. To begin with, we see considerable logic to Judge Leibell's suggestion that permitting the shipowner to bring a limitation proceeding within six months after every claim would severely undermine the 1936 amendment. Because the filing of a limitation petition brings all pending claims into district court, regardless of how far along they may be in litigation, this interpretation would allow many of the abuses the 1936 amendments were meant to cure. For ex-

ample, if a second claim is filed while the first claim is in trial, the shipowner could have the matter removed to district court by instituting a limitation proceeding.[6]

We also see good reason for construing section 185, in a close case, so as to avoid what may be an injustice to the claimants. It is true that early cases construing the Act tilted heavily in favor of the shipowner.[7] The rationale for doing so appeared to have been that this would help promote a healthy merchant marine. *See, e.g., American Car & Foundry Co. v. Brassert,* 289 U.S. 261, 263, 53 S.Ct. 618, 619, 77 L.Ed. 1162 (1933) ("The statute limiting the liability of shipowners was enacted to encourage investments in ships and their employment in commerce."); *Norwich Co. v. Wright,* 80 U.S. (13 Wall.) 104, 121, 20 L.Ed. 585 (1871) ("The great object of the law was to encourage shipbuilding and to induce capitalists to invest money in this branch of industry."). *See generally Benedict on Admiralty,* p. 236 *supra,* § 7, at 1–43—44.

Recent events have cast doubt on the continuing vitality of this rationale. As Justice Black noted in *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954),

> Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsi-

dies paid out of the public treasury rather than subsidies paid by injured persons. *Id.* at 437, 74 S.Ct. at 623 (dissenting opinion for four members of the Court). Commentators agree: "[T]he Limitation Act, passed in the era before the corporation had become the standard form of business organization and before present forms of insurance protection (such as Protection and Indemnity insurance) were available, shows increasing signs of economic obsolescence." G. Gilmore & C. Black note 2 *supra,* § 10–4, at 822. *Accord* Eyer, note 1 *supra,* at 389 & nn. 128–32; Note, *Limitation of Shipowners' Liability—The Brussels Convention of 1957,* 68 Yale L.J. 1676, 1682–83, 1713 (1959).

This case illustrates the harshness of the rule. Because the Kadena de Amor was badly damaged in the explosion, the highest bid for the vessel at the United States marshal's sale was $3,000. Esta Later claims it is entitled to limit its liability to this fund.[8] This is an absurdly small amount compared to the damages suffered by the claimants: The Manleys have lost a son, while James Ignacio suffered burns over 90 percent of his body, a broken arm and a fractured skull. At the time the Ignacios made their demand on Fireman's Fund, James Ignacio had already incurred $250,000 in expenses for intensive care, surgery and skin grafting; presumably further costs for ongoing treatment, surgery and rehabilitation have accrued and will continue to accrue.[9] We are, of course, bound to follow the statute if its

---

**6.** Esta Later suggests we avoid this problem by holding that the filing of a limitation petition does not affect claims pending for more than six months. While this might be an appealing solution, it is precluded by the language of the statute which provides that the filing of a petition shall cause *all* pending claims to cease. 46 U.S.C. § 185.

**7.** *See, e.g., Coryell v. Phipps,* 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943) (describing the "well settled policy to administer the [Act] not 'with a tight and grudging hand' but 'broadly and liberally' so as 'to achieve its purpose to encourage investments in shipbuilding....") (citations omitted); *Larsen v. Northland Transp. Co.,* 292 U.S. 20, 24, 54 S.Ct. 584, 585, 78 L.Ed. 1096 (1934) ("Statutory provisions for limitation of liability should be construed liberally in order to effectuate their beneficent

purposes."); *The Chickie,* 141 F.2d 80, 85 (3rd Cir.1944) (admiralty rules are not intended to restrict owners in claiming the benefits of the limitation of liability statute, but to aid them).

**8.** Esta Later apparently assumes the inapplicability of section 183(b) which provides that an owner of a seagoing vessel cannot limit liability for loss of life or bodily injury to less than $420 per ton. *See* note 6 *supra.* This issue is not before us. However, even if section 183(b) were applicable, the available limitation fund would amount to less than $32,000 for the 76-ton Kadena de Amor.

**9.** This would not be the first time that the fund available under the Act turned out to be negligible in the face of a major accident. Such a disaster was the impetus for adding the "loss of

purport is clear. But where, as here, we are asked to select between equally plausible interpretations, it is appropriate to consider the effects on the parties involved. We choose the interpretation that avoids a patently unjust result.

Finally, we are unimpressed with Esta Later's suggestion that providing a single six-month limitation period will lead to untoward results. In the first place, the language we are interpreting has been on the books for over 50 years; the only judicial interpretation of it has been the one that Esta Later suggests would cause serious problems. If problems were destined to develop, there has certainly been ample time for them to do so. The fact that there has been relatively little litigation under this section suggests that the interpretation adopted in *The Grasselli* is reasonable.

In any event, shipowners are in a poor position to rely on equitable principles in seeking an expansive interpretation of the statute. The Liability Act provides shipowners a generous measure of protection not available to any other enterprise in our society. Many have suggested that the Act, a relic of an earlier era, provides protections that are neither warranted nor consistent with current reality. *See, e.g., In re United States Dredging Corp.*, 264 F.2d 339, 341 (2d Cir.), *cert. denied*, 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1545 (1959) (Hand, J.) ("it is at least doubtful whether the motives that originally lay behind the limitation are not now obsolete"); G. Gil-

more & C. Black, note 2 *supra*, § 10-4, at 821–22; Eyer, note 1 *supra* at 389; Note, page 11 *supra*, at 1713. With the availability of incorporation, insurance and other devices to protect shipowners against major disasters, the Liability Act seems oddly out of place in the modern economy; its application could well lead to wholly unexpected and harsh results.[10] We see no plausible reason for adopting an interpretation of the Act that will exacerbate these consequences.[11]

### Conclusion

Misshapen from the start, the subject of later incrustations, arthritic with age, the Limitation Act has "provided the setting for judicial lawmaking seldom equalled." Eyer, *supra* note 1, at 374. It is a task we undertake uneasily, but one we cannot shirk. We hope we have done the best that can be with the provision now before us, but note that this is an area that could profit from modern legislative attention. While the solution we have devised may be acceptable given the current statutory framework, Congress might be well advised to examine other approaches or to consider whether the rationale underlying the Liability Act continues to have vitality as we enter the last decade of the twentieth century.

AFFIRMED.

---

life" amendments, sections 183(b)-(f), to the Act: In 1934, a fire on the steamship Morro Castle resulted in the loss of 135 lives. Because the vessel was almost completely destroyed, the owner's liability was limited to $20,000. G. Gilmore & C. Black, note 2 *supra*, § 10-33, at 919.

**10.** One commentator has pointed out, for example, that the Liability Act could be used to shield shipowners from damages arising from "pollution of navigable waters by oil and other harmful substances." G. Gilmore & C. Black, note 1 *supra*, § 10-4(a), at 824. Perhaps the most noted recent example of this was the sinking of the Torrey Canyon, which spilled 120,000 tons of crude oil into the English Channel in 1967. The subsequent clean-up of the beaches and shorelines on both sides of the Channel cost over $16 million; a fund of $50—the value of one salvaged lifeboat—was available to the claimants.

*Id.* at 823 n. 13e; *Benedict on Admiralty*, p. 236 *supra*, § 111, at 9–3.

**11.** In light of these considerations, we reject Esta Later's argument that the Manleys are equitably estopped from relying on the Act's six-month limitation period. The Act gave Esta Later a clear method for avoiding liability. To take advantage of this generous protection, Esta Later had the burden of complying with the statutory requirements. It failed to do so. The principle which underlies all equity rulings is embodied in the maxim "vigilantibus non dormientibus aequitas subvenit," that is, equity aids the vigilant, not those who slumber on their rights. 2 J. Pomeroy, *Equity Jurisprudence* § 418 (5th ed. 1941) at 169. Esta Later has failed to pursue its rights with diligence; it cannot now shift the burden of its failure to others.