In re SAUSE BROTHERS OCEAN TOW-
ING, a corporation, as Owner/Charter-
er of the T/V OCEAN SERVICE, Plain-
tiff,

In a Cause for Exoneration from
or Limitation of Liability.

and related cases.

Civ. No. 89–609–RE.

United States District Court,
D. Oregon.

July 9, 1991.

Guy C. Stephenson, Schwabe, Williamson & Wyatt, Portland, Or., for plaintiff Sause Bros. Ocean Towing and third-party defendant BP North America Petroleum, Inc.

Douglas M. Fryer, Jeffrey L. Jernegan, Mikkelborg Broz Wells & Fryer, Seattle, Wash., Sydney L. Chandler, Chandler, Lesan, Stokes & Finneran, Coos Bay, Or., for claimant/third-party plaintiff Canada.

Paul N. Wonacott, John M. Cowden, Kim Jefferies, Wood Tatum Mosser Brooke & Landis, Portland, Or., for claimant/third-party plaintiff British Columbia.

Kenneth O. Eikenberry, Atty. Gen., Ann C. Essko, William C. Frymire, Asst. Attys. Gen., Olympia, Wash., Michael E. Haglund, Michael K. Kelley, Haglund & Kirtley, Portland, Or., for claimant/third-party plaintiff State of Wash.

Stuart M. Gerson, Asst. Atty. Gen., Charles H. Turner, U.S. Atty., Jack G. Collins, First Asst. U.S. Atty., Chief, Civ. Div., Portland, Or., Philip A. Berns, Atty. in Charge, West Coast Office, Warren A. Schneider, Asst. Atty. in Charge, Robert J. Cunningham, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, San Francisco, Cal., for claimant U.S.A. and U.S.A. as Trustee for Hoh, et al.

David S. Teske, David S. Teske & Associates, Seattle, Wash., for claimants LeBlanc, et al.

Dean D. DeChaine, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., Hugh M.G. Braker, Port Alberni, B.C., Canada, for claimants Nuu–Chah–Nulth Tribal Council, et al.

Robert P. Zuanich, Jones & Zuanich, Seattle, Wash., for Dale Marble, Dominick Pepetti.

Gary F. Kollmuss, pro se.

Christopher Harvey, Russell & DuMoulin, Vancouver, B.C., Canada, for Marilyn Dobrilla for Bill Dobrilla (deceased).

Leigh R. Hilbert, pro se.

Ralph Tieleman, pro se.

Janice R. Dillon, Vancouver, B.C., Canada, for claimants Wickaninnish Is. Properties Ltd.

Ken Zakreski, pro se.

Jan Thomas Baisch, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., for claimants John Does # 1–100.

Garry P. McMurry, Portland, Or., for claimants Pacific Rim Resort Properties, Inc., et al.

Kathleen M. Ker, La Liberte Hundert, Vancouver, B.C., Canada, for claimants Clayton Fuller and Stanley Fuller, et al., and claimants Pacific Pride Seafoods Corp.

Ucleulet Band Council, pro se.

Mark D. Andrews, Barrister and Sol., Vancouver, B.C., Canada, for claimants Susan Etherington, et al., and Mark Klotz, et al.

Kevin R. Lyon, Cullen & Cullen, Olympia, Wash., for claimants Quileute Tribal Council.

Sharon Janeson, Richard, B.C., Canada, for claimants Richard Alan Holmes and Matthew Cardell, dba Al's Gooseneck Corp.

Brett A. Purtzer, Tacoma, Wash., for claimants Kurt Marble and Jon Schmidt.

David F., Margaret R., and Stephen J. Rae–Arthur, pro se.

Arthur Clarke, pro se.

Louis J. Zivot, Lang, Michener, Lawerence & Shaw, Vancouver, B.C., Canada, for claimants T. Cameron Scott, Ron Dunsmore and Ian J.W. Garcia.

Jeffrey J. Bodé, Bellingham, Wash., for claimants Steve Lawson and Suzanne Hare.

## FINAL AMENDED OPINION

(this opinion reflects all amendments thereof to date)

REDDEN, Chief Judge.

Plaintiff Sause Brothers Ocean Towing (SBOT) is an Oregon corporation with its principal place of business in the State of Oregon. At the time of the casualty, SBOT was registered to do business in the State of Washington. SBOT filed this maritime claim for exoneration from or limitation of liability in accordance with 46 U.S.C.App. § 183, and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

SBOT filed this limitation action following an oil spill into the navigable waters of the United States near Grays Harbor, Washington. A court trial was held from December 4, 1990, through December 10, 1990, in Portland, Oregon. The action was to be tried in two parts: the first, is for the determination of liability; the second, to be held at a later date, is to determine the damages incurred by each claimant. For the reasons which follow, I find SBOT cannot be exonerated from or limit their liability, pursuant to 46 U.S.C.App. § 183(a), for the damages incurred by the claimants in this action.

The wire rope connecting the tug T/V OCEAN SERVICE, operated by SBOT, to the barge T/B NESTUCCA parted in open water on December 22, 1988. During retrieval operations, the tug collided with the barge piercing one of the barge's compartments causing the discharge of approximately 230,000 gallons of Bunker "C" oil into the navigable waters of the United States. Oil drifted onto the Washington State and the British Columbia, Canada shorelines.

The governments of Her Majesty the Queen in Right of Canada (HMQ Canada) and the Province of British Columbia, Canada, have filed claims against SBOT for damages relating to the cost of cleanup and damages to the natural resources and wildlife due to the spill. The State of Washington and the government of the United States also filed claims against SBOT, as well as BP North America Petroleum, Inc. (BP), owner of the cargo. During the course of the court trial, the State of Washington and the United States government stated in open court, and later submitted documents stating, that they had settled their claims with SBOT and BP. Therefore, this opinion only addresses the liability arguments raised by the remaining claimants, specifically HMQ Canada and British Columbia, against SBOT. Accordingly, all claims against BP have been settled.

## BACKGROUND

SBOT operated the tug OCEAN SERVICE under a bareboat charter from Maritrans Operating Partners, Ltd. The tug is a twin-screw steel tugboat of 193 gross tons with official number 507101, approximately 121 feet long, 32.25 feet wide and 10.25 feet deep. The tug is powered by two diesel engines with a combined delivered horsepower of approximately 3600 h.p. The OCEAN SERVICE was equipped with an Orville Hook barge retrieval device.

The barge NESTUCCA is a steel tank barge bearing official number D569658 of 5,339 gross tons, 5,339 net tons, and a length of 301.80 feet. The barge contains eleven cargo tanks with on-board pumps and piping. SBOT owned the barge NESTUCCA at the time of the casualty.

The towing wire aboard the OCEAN SERVICE was a 2¼ inch diameter, 6 × 25 independent wire core, steel rope. The manufacturer of that wire rope issued a mill-test certificate on or about June 26, 1987, and the American Bureau of Shipping issued a compliance certificate on or about June 23, 1987 that stated the wire met designated specifications. The wire met the strength specification of 437,000 pounds. This wire was installed on the towing winch of OCEAN SERVICE on November 4, 1987. On August 5, 1988, after 2,122 towing hours, the towing end of the wire was trimmed and a new "D" socket was poured. On December 11, 1988, the tow wire was "upended" and a new towing "D" was attached. At the time the towing

wire was upended, the wire's total towing hours were approximately 3,620.

On December 21, 1988, the barge NESTUCCA was loaded with Bunker "C" oil at Ferndale, Washington. The starboard number one tank contained approximately 6,012.56 barrels of product upon departure. The tug and barge departed Ferndale around 1340 hours on December 21, 1988, bound for Aberdeen, Washington, to off-load some of the cargo, then on to Portland, Oregon. During this voyage, the OCEAN SERVICE was manned by the master, mate, chief engineer, assistant engineer, and the cook.

At the time of departure, the winch held approximately 2300 feet of towing wire. The towing wire was connected to the barge by means of a "fish-plate" connected to chain-surge gear.

On December 22, 1988, at approximately 2315 hours, the tug and barge arrived off Grays Harbor, Washington, near buoy number three. Shortly before, the tug JANET R had towed the barge BARANOF across the Grays Harbor bar and had communicated the condition of the bar to Captain May, the master of the OCEAN SERVICE.

The OCEAN SERVICE stood by buoy number three while awaiting an outbound ship to clear the bar. At this time, approximately 2330 hours, the master shortened the tow between the OCEAN SERVICE and the NESTUCCA to approximately 1500 feet. During the course of these operations, there was little wind and the swells were estimated by Captain May to be from six to eight feet. After shortening the tow, the master lowered the towing pins and set the air brake at three-quarters. The master then returned to the wheelhouse. While turning the tug to starboard, the tow wire suddenly parted at the winch. The starboard turn brought the tow wire across the starboard stern quarter at approximately a forty-five degree angle when the wire parted.

After the tow wire parted, the barge drifted closer toward shore near buoy number five. Captain May first decided to use the Orville Hook to retrieve the barge.

Captain May abandoned this plan because the seas were changing, and the barge was drifting into shallower waters toward the breakers near the north jetty. The Orville Hook was stowed in an unassembled condition and the captain felt he did not have time to deploy it to retrieve the drifting barge. At that point, the captain decided to exercise his option of last resort, putting two men aboard the barge. The tug backed its stern next to the side of the barge so the mate and the assistant engineer could leap onto the barge. During the first attempt, a wave caused the barge to go down and the tug to go up, the tug's port rudder then came down into the barge holing the number one starboard compartment. The hole consisted of a six-foot crack on the starboard bow area, approximately one to two feet below the deck.

The two men were successfully transferred from the tug to the deck of the barge on the second attempt. Once aboard the barge, they were unable to pass a retrieving line to the tug for deployment of an emergency towing line. The collision between the tug and the barge damaged the tug's port rudder greatly restricting the tug's maneuverability. The Orville Hook was then deployed by the captain and the chief engineer with help from the cook. The barge was successfully retrieved with the Orville Hook. Upon retrieval, the barge was towed out to sea, away from Grays Harbor. The two men aboard the barge were forced to spend the rest of the night in a pumphouse on the barge due to the increasing wind and heavy seas.

The tug JANET R came out to assist the OCEAN SERVICE and the NESTUCCA. Once the seas permitted, around 0720 hours on December 23, the JANET R went alongside the barge NESTUCCA and picked up the OCEAN SERVICE's mate and assistant engineer. Around 0905 hours the same day, the Coast Guard delivered a barge "patching kit" to the JANET R. It was not until December 24, at approximately 0030 hours, that the weather had subsided to the point the JANET R was able to put two crewmen aboard the NESTUCCA to patch the hole.

The OCEAN SERVICE and the NESTUCCA arrived off the Columbia River on December 24, 1988, where the tow was transferred from the OCEAN SERVICE to the tug JANET R. At approximately 0939 hours the same day, the SBOT tug SALISHAN also attached a tow line to the NESTUCCA and the flotilla then proceeded into Astoria, Oregon, arriving at approximately 1130 hours.

## DISCUSSION

### (1) Limitation of Liability Act.

 The Limitation of Liability Act, 46 U.S.C.App. § 181 *et seq.*, was first enacted in the United States in 1851. The Act was fashioned after laws of certain European seafaring nations for the purpose of limiting a shipowner's liability to the value of the vessel and its cargo. *See Esta Later Charters, Inc. v. Ignacio*, 875 F.2d 234, 235 (9th Cir.1989). Pursuant to § 183:

> [t]he liability of an owner of any vessel, whether American or foreign, ... for any loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

Claimants have the initial burden of proving negligence or unseaworthiness; once established, the burden then shifts to the vessel's owner[1] to prove lack of privity or knowledge. *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1557 (11th Cir. 1987). The determination of whether liability is to be limited is left to a two-step analysis by the court: (1) what, if any, acts of negligence or conditions of unseaworthiness caused the accident, and (2) whether the vessel owner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. *Id.*

 SBOT notes that none of the claimants in this action is a cargo owner or seaman. The claimants are parties, public and private, seeking redress for damage to shorelines, natural resources and personal property. The warranty of seaworthiness does not extend to such parties. The warranty only applies to the crew of the vessel and the cargo. *The CALEDONIA*, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644 (1895); *The Petition of the United States (INVINCIBLE)*, 216 F.Supp. 775, 781 (D.Or.1963). To prevail, claimants must prove negligent acts caused the casualty and that those acts were within the privity and knowledge of SBOT.

(a) Negligent Acts.

The winter voyage attempted by the tug OCEAN SERVICE and the barge NESTUCCA could expect heavy seas and four bar crossings at Grays Harbor and the Columbia River. The oil carried by the barge presented a significant risk to the environment if a spill were to occur.

### (i) The Tow Wire.

 Claimants contend, that the wire was corroded, improperly cared for, and not thoroughly inspected for defects that may have led to the wire's parting.

A tow wire should necessarily be able to withstand the size of the load as well as the dynamic forces placed upon it by the rough seas. At the time this particular tow wire parted, the conditions were moderate and the tug was towing the barge from three to four knots while maneuvering for the bar crossing. The load upon the tow wire was substantially lower than the 487,000 pound tensile strength it was rated to withstand. The portion of the tow wire that was saved and examined showed that it was corroded and abraded prior to its failure December 22, 1988.

Claimants argue that SBOT was negligent in their policy not to lubricate tow

---

**1.** "It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner *pro hac vice.*" *Reed v. Steamship Yaka*, 373 U.S. 410, 412, 83 S.Ct. 1349, 1351, 10 L.Ed.2d 448 (1963). SBOT, as the bareboat charterer of the OCEAN SERVICE, will be treated as the "owner" of the OCEAN SERVICE in this action. *See also Indian Ridge Canning Co. v. The Captain Nick*, 98 F.Supp. 664 (D.C.La.1951).

wires as recommended by the manufacturer. Numerous expert witnesses testified during the court trial. From their testimony, it appears that while lubrication of tow wires is not required, it helps slow its rate of corrosion. When a tow wire is corroded, that corrosion is not uniform along the length of the wire; the nonconcentric shape of the wire, therefore, is further weakened by the force placed upon it by the dynamic (moving) load. Lubrication of the tow wire decreases the friction caused by the wire rubbing against itself when being wound onto the drum. According to one expert, when the wires slide against each other, absent lubricant, this weakens the wire and contributes to lower load capacities.

The tow wire exhibited at trial showed signs of abrasion. The abrasion could have been caused by a number of factors. First, SBOT admits that the practice of dragging the wire on the ocean floor during towing and spooling operations could abrade the wire. While such contact with the bottom cannot be avoided, such conditions would necessitate careful inspection of the wire as it is rewound on the drum. The evidence also showed that the rollers on the OCEAN SERVICE were very worn and could have caused the abrasions shown on the tow wire. Testimony also suggested that the chafing plates on the OCEAN SERVICE were worn. These chafing plates were replaced shortly after the casualty and discarded before they could be examined or even photographed. Based on the testimony and the worn condition of the rollers, I will infer that the chafing plates were in a similar worn condition and contributed to the wear upon the tow wire as it contacted them while being spooled in, let out or while in tow.

SBOT's normal inspection procedures entailed the master of the tug viewing the wire as it was drawn in or let out from the boat deck and the chief engineer viewing the wire from the fairlead winch controls. Both persons were from six to ten feet from the wire at those stations. The tow wire was drawn in at a speed of approximately one to three miles per hour. At this distance and speed, this method of inspection is inadequate to detect breaks of individual wires, abrasion or corrosion of the tow wire.

SBOT contends it required its masters to document wire inspections in the log book. No such entry occurred in the OCEAN SERVICE log book in 1988. Trip reports were also to be submitted by the master to SBOT management. The OCEAN SERVICE had not submitted a trip report between May 1988 and the date of the casualty.

SBOT also required the tug masters to utilize a Marlin Spike to separate the tow wire and inspect its core. Captain May testified that he had never used the Marlin Spike as directed because he believed it damaged the wire.

SBOT notes that the tow wire was upended and a new towing "D" poured December 11, 1988. To upend the tow wire, the towing end was tied off and the rest of the wire was let out. The old towing end was then attached to the drum and the tow wire was spooled in. The crew stood at the stern of the tug and washed the mud off of the tow wire with a fire hose as it came aboard. Captain May testified that the wire was inspected at that time. Nevertheless, Captain May admitted that the upending procedure was not completed until after dusk and the OCEAN SERVICE's lights were used to finish the procedure. Spraying the tow wire with a fire hose at dusk would leave ample opportunity to overlook signs of abrasion and corrosion that would indicate dangerous weakening of the tow wire. These are not reasonably acceptable methods of inspection. *See Slaten v. Hopemount Shipping Co.,* 345 F.2d 451 (5th Cir.1965) (district court decision affirmed denying limitation of liability where no regular maintenance and inspection of vessel's cables).

There was evidence presented detailing inspection methods used by other towing companies. Generally, they placed the tow wire on a pier and walked the length of the wire looking for corrosion, abrasion, broken wires, or other defects.

SBOT argues that while the wire was corroded and showed signs of abrasion,

there was no evidence that the wire parted for those reasons. SBOT contends that the wire hung up on the bottom while the tug was turning and parted due to the tremendous increase in pressure created while turning around a small radius on the ocean floor. The evidence put forth by .SBOT establishing this theory is circumstantial at best. The preponderance of all the evidence before the court demonstrates that the tow wire was defective and SBOT was negligent in their maintenance and inspection of that wire.

■ Claimants contend that the doctrine of *res ipsa loquitur* applies in this instance where the tow wire parted in relatively calm seas under moderate conditions. The owner of a tug is not an insurer. The loss of a tow does not raise the presumption of fault. *Carlsen v. A. Paladini, Inc.,* 5 F.2d 387, 388 (9th Cir.1925). Further, the parting of a tow wire does not give rise to the presumption of negligence. *Stevens v. The White City,* 285 U.S. 195, 204, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932). Therefore, the doctrine of *res ipsa loquitur* is inapplicable in this action.

*(ii) The Crew of the OCEAN SERVICE.*

The crew consisted of Captain May and the chief engineer, both of whom have had thousands of hours of ocean towing experience. At the time of the casualty, Captain May possessed a U.S. Coast Guard operator's license for uninspected towing vessels upon oceans and inland waters. Captain May became a towing vessel master for SBOT in 1971. The chief engineer, Jack Wilson, spent six years in the United States Navy and has been employed in the ocean towing industry since 1973. In 1983, Wilson obtained a United States Coast Guard license to United States Merchant Marine Officer as an Assistant Engineer of uninspected motor vessels of not more than 4,000 horsepower.

The mate, Gary Rickey, obtained a United States Coast Guard license to United States Merchant Marine Officer as Mate of Freight and Towing Vessels of not more than 500 gross tons, upon oceans not more than 200 miles offshore, in January, 1986.

The assistant engineer, Curtis Bartley, joined SBOT on October 30, 1988. Prior to his employment with SBOT, Bartley worked in the logging industry from 1983 to 1988. Bartley was a certified welder. Cecil Johnson was the cook aboard the OCEAN SERVICE and had worked for SBOT as a cook since March of 1985.

■ Title 46 U.S.C. § 8104 governs deck watches to be manned on vessels. Section 8104(g) states:

> [o]n a towing vessel (except a vessel to which subsection (c) of this section applies), and offshore supply vessel, or a barge to which this section applies, that is engaged on a voyage of less than 600 miles, the licensed individuals and crew members (except the coal passers, firemen, oilers, and water tenders) may be divided, when at sea, into at least 2 watches.

Section 8104(h) states:

> [o]n a vessel to which section 8904 of this title [46 USC § 8904] applies, an individual licensed to operate a towing vessel may not work for more than 12 hours in a consecutive 24–hour period except in an emergency.

Section 8904 refers to towing vessels at least 26 feet long, and applies to the OCEAN SERVICE which is 121 feet long.

During his testimony, Captain May admitted that his watch was scheduled to end at the time they reached the Grays Harbor bar before the casualty. Captain May stated that it is SBOT policy that the master of the vessel take her over the bar. Therefore, Captain May would violate § 8104(h) by remaining on. duty. Captain May also stated that it was common for the master, as well as some of the crew, to exceed the 12–hour limit, and SBOT was aware of this practice. SBOT noted that they had told their masters to stay within the statutory confines but they never checked Captain May's log to see if he and his crew had complied.

The parties disagree whether the voyage is over or under the 600 mile limit imposed for a two-watch system as required by § 8104(g). Regardless, of the voyage dis-

tance, it is sufficient to conclude that the violation of the 12–hour limit is negligent behavior on part of Captain May, and SBOT for its failure to enforce compliance with the rule. The SBOT policy that the vessel's master must take her over the bar is prudent. Such bar crossings, however, should be made within the 12–hour limit set forth by the statute.

■ Claimants next allege that SBOT was negligent by not manning the OCEAN SERVICE with able bodied seamen as required by 46 U.S.C. 8702(b)(2). Section 8702(b)(2) states:

> (b) A vessel may depart from a port of the United States only if at least—
>
> . . . . .
>
> (2) 65 percent of the deck crew (excluding licensed individuals) have merchant mariners' documents endorsed for a rating of at least able seaman, except that this percentage may be reduced to 50 percent on a vessel permitted under section 8104 of this title [46 USC § 8104] to maintain a 2–watch system.

For purposes of this limitation action, I find the voyage to be less than 600 miles and a two-watch system to be sufficient. Nevertheless, SBOT admits that none of its crewmen was certified as an able seaman as required under § 8702(b)(2). It is for Congress, not the courts, to set forth manning requirements for merchant vessels. *United States v. Buckeye Steamship Co.*, 287 F.2d 679, 680 (6th Cir.1961). The manning statutes are primarily safety statutes. *O'Hara v. Luckenbach Steamship Co.*, 269 U.S. 364, 46 S.Ct. 157, 70 L.Ed. 313 (1926). Such safety legislation should be liberally construed to effectuate congressional intent. *United States v. Blue Water Marine Industries, Inc.*, 661 F.2d 793, 796 (9th Cir.1981). The burden lies upon SBOT to demonstrate that the statutory violation could not have contributed to the casualty. *The PENNSYLVANIA*, 86 U.S. (19 Wall) 125, 136, 22 L.Ed. 148 (1874); *The DENALI*, 105 F.2d 413, 418 (9th Cir.1939); *Waterman S.S. Corp. v. Gay Cottons*, 414 F.2d 724, 736–37 (9th Cir.1969).

Once the tow wire parted, Captain May had his crew flake out the line for deployment of the Orville Hook. The Orville Hook was kept in a disassembled condition. None of the crew, except for Captain May, had ever deployed the Orville Hook or practiced assembling it. Once the line was flaked out, Captain May decided he had insufficient time to retrieve the runaway barge with the hook. Since the barge was not equipped with an insurance wire, Captain May was left with only one option; putting two men aboard the barge and heaving an emergency tow line back to the tug. Putting men aboard a barge is the most dangerous method by which to retrieve a runaway barge.

The barge NESTUCCA had previously been equipped with an insurance wire prior to her purchase by SBOT. An insurance wire consists of a spare towing wire prerigged for rapid deployment in an emergency where the main towing wire is disconnected. The wire is fastened to the barge's bow then hung with light, easily broken fasteners around the bow, down the side and coiled on the stern deck. The steel wire rope is connected to a floating line and a buoy that trails behind the barge. If the tow line between the tug and the barge parts, the tug merely picks up the insurance wire and shackles the wire rope portion to the remaining tow wire on the winch. The light fastenings break away and the barge is again in tow. Insurance wires are not without their problems, i.e., if the buoy is washed aboard the barge in heavy seas, or if the line became tangled, they are unusable for the barge retrieval procedure.

Since the crew was unfamiliar with the Orville Hook and had not been trained to use it, when an emergency strikes, it would have been prudent to rig an insurance wire. The ultra hazardous nature of the cargo transported, coupled with the inexperience of the crew, contributed greatly to this casualty. SBOT has a non-delegable duty to man their vessels with an adequate crew. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151 (2d Cir.1978).

> A vessel owner has a duty to supply an adequate and competent crew for the

vessel's intended voyage. (citations omitted) The crew must "not merely be competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen." (citation omitted).

*In re Ocean Foods Boat Co.*, 692 F.Supp. 1253, 1259 (D.Or.1988). I find SBOT negligent in their actions concerning this accident. The inexperience of the assistant engineer and the cook, coupled with the lack of able seaman certification, contributed to the casualty. If experienced crewmen were available, the Orville Hook may have been deployed successfully the first time without having to put two crewmen aboard the barge. Further, the lack of reasonable tow wire inspection procedures contributed to the accident in that had they been more thorough, the tow wire's corroded and abraded condition would have been discovered before it parted under tow.

(b) Privity or Knowledge of the Owner. ▪ SBOT is the owner of the vessel seeking limitation of liability. The burden of showing lack of privity and knowledge of the negligence that caused the spill now shifts to SBOT. *Waterman*, 414 F.2d at 738. "The measure in such cases is not what the owner knows, but what he is charged with finding out." *States Steamship Co. v. United States*, 259 F.2d 458, 466 (9th Cir.1957) *quoting Great Atlantic & Pacific Tea Co. v. Brasileiro*, 159 F.2d 661, 665 (2nd Cir.1947). *See also Ocean Foods*, 692 F.Supp. at 1259.

SBOT knew the methods by which the crew of the OCEAN SERVICE inspected and maintained the tow wire. SBOT established a policy that a Marlin Spike would be used to inspect the core of the tow wire and should have known that Captain May did not use the device. SBOT knew that trip reports were not being turned in from the OCEAN SERVICE since May 1988. SBOT should have inspected the log of the OCEAN SERVICE to see whether tow wire inspections were documented, as well as whether the crew was complying with the 12–hour watch statute. SBOT knew that they were required to man their vessels with competent crew, some of which were to be able seaman certified, as required by law. SBOT knew that the winter voyage, transporting hazardous cargo, could encounter exigencies that would require an experienced crew. SBOT also knew that most of the crew had not been trained how to deploy the Orville Hook in case the tow wire parted. For these reasons I find SBOT had privity and knowledge of the negligent acts that caused the casualty near Grays Harbor, Washington, on December 22, 1988. In sum, I find ordinary negligence on the part of SBOT, and pursuant to my Order March 29, 1991, all claims of willful negligence and willful misconduct are dismissed. The question of damages, including punitive damages, is reserved for resolution in the second phase of this litigation. Regardless, SBOT's liability is not limited under 46 U.S.C.App. § 183.

### CONCLUSION

I find Sause Brothers Ocean Towing is ineligible for limitation of liability pursuant to 46 U.S.C.App. § 183. The claims of willful negligence and willful misconduct are dismissed. The damages to be awarded, including questions of punitive damages, will be decided in the second phase of this litigation.